Terri WANGEN, a minor, by her guardian, Charles R. Wangen, Charles R. Wangen, Special Administrator of the Estate of Christopher DuVall, deceased, Charles R. Wangen, Special Administrator of the Estate of Kip Wangen, deceased, Charles R. Wangen, individually and Ramona M. Wangen, Plaintiffs-Respondents,

v.

FORD MOTOR COMPANY, Defendant-Appellant-Petitioner, and Robin DUVALL, Patrick J. Hawley, Allstate Insurance Company, American Family Mutual Insurance Co., Thomas J. Curran, Milwaukee Mutual Insurance Co., and Republic National Life Insurance Co., Defendants. [Case No. 77–893.]

Robin DUVALL, Plaintiff-Respondent,

v.

FORD MOTOR COMPANY, Defendant-Appellant-Petitioner, and Patrick HAWLEY, Allstate Insurance Company, Thomas Curran and Milwaukee Mutual Insurance Co., Defendants. [Case No. 77–894.]

Supreme Court

*Nos. 77–893, 77–894. Argued January 7, 1980.— Decided June 27, 1980.*

(Also reported in 294 N.W.2d 437.)

For the appellant there were briefs by *Walter L. Merten, Paul E. Schwemer* and *Merten & Schwemer, S.C.,* of Milwaukee, and oral argument by *Walter L. Merten* and *Paul E. Schwemer.*

For respondents, Terri Wangen, Charles R. Wangen and Ramona M. Wangen, there was a brief by *D. G. Graff Law Offices, S.C.,* of Madison, and oral argument by *D. G. Graff; Johnson, Swingen & Sandell* and *Easton & Harms, S.C.,* of counsel, all of Madison, for respondent, Robin DuVall, join in the brief.

SHIRLEY S. ABRAHAMSON, J. The central question on appeal is whether punitive damages are recoverable in a product liability suit based on negligence or strict liability in tort (sometimes referred to as strict products liability). We conclude that they are recoverable.

I.

This appeal involves two lawsuits which were commenced against Ford Motor Company and others as a result of an automobile accident on July 1, 1975 involving a 1967 Ford Mustang. The cases were consolidated

and are before us at the pleading stage; all facts set forth are derived from the pleadings.

The occupants of the 1967 Ford Mustang involved in the accident were Robin DuVall, the driver, Terri Wangen, her sister, Kip Wangen, her brother, and Christopher DuVall, her son. Robin DuVall stopped her 1967 Ford Mustang at an intersection to make a left turn, and a car driven by Patrick J. Hawley ran into the rear end of the Mustang. The DuVall Mustang was pushed into the opposite lane of travel where it collided with a car driven by Thomas J. Curran. The Mustang's fuel tank ruptured, a fire ensued, and all occupants of the Mustang sustained severe injuries. Christopher DuVall and Kip Wangen died as a result of their injuries.

Two lawsuits were commenced. One is by Terri Wangen and Charles R. Wangen, as special administrator of the estates of Christopher DuVall and Kip Wangen, and Charles R. Wangen and Ramona M. Wangen, individually, against Ford Motor Company, Hawley, Curran, Robin DuVall and their respective insurance carriers. The second lawsuit is by Robin DuVall against Ford Motor Company, Hawley, Curran and their respective insurance carriers.

Plaintiffs in both lawsuits seek compensatory damages from all named defendants and punitive damages from Ford Motor Company.

The claim for compensatory damages against Ford is based on Ford's alleged negligence in the design, manufacture, assembly, sale and distribution of the 1967 Mustang and on Ford's strict liability in tort arising out of the sale of the 1967 Mustang in a defective condition unreasonably dangerous to users. *Dippel v. Sciano*, 37 Wis.2d 443, 155 N.W.2d 55 (1967).

The allegations in support of recovery of punitive damages from Ford Motor Company are that Ford knew that the fuel tanks on this and other 1967 Mustangs were dangerously defective before and after the manufacture of the car in question; that corrective design changes

were made in models manufactured after this particular model but prior to the date of the instant accident; that Ford failed to warn users of the car of the potential danger both after the danger became apparent and after Ford had changed the design to reduce the danger; that Ford failed to recall, repair or modify the defective vehicles after the defect became apparent in order to avoid the expense of those procedures and to prevent potential lost sales caused by adverse publicity; and that Ford's conduct in failing to warn, repair or recall the known defective vehicles constituted intentional, deliberate, reckless, willful, wanton, gross, callous, malicious and fraudulent disregard for the safety of users of Ford's product.

Ford Motor Company moved to dismiss all allegations in both complaints relating to punitive damages under sec. 802.06(2)(f), Stats., on the ground that the complaints for punitive damages fail to state a claim against the defendant, Ford Motor Company, upon which relief can be granted.[1] The circuit court denied Ford's motion, concluding that punitive damages may be awarded in product liability cases given a satisfactory evidentiary basis. Review of the circuit court's order was sought, and the court of appeals, in an unpublished decision (May 31, 1979) divided the complaint for punitive damages into five categories of actions and concluded that punitive damages are recoverable in some and not in others. Specifically the court of appeals concluded (1) punitive damages are recoverable in a products liability suit for compensatory damages predicated on strict liability in tort; (2) punitive damages are not recoverable in a product liability suit for compensatory damages predicated on negligence; (3) punitive damages are recoverable in an action which survives the death of the injured person; (4) punitive damages are not recoverable

---

[1] Sec. 802.06(2)(f), Stats., provides: ". . . the following defenses may be made by motion . . . (f) failure to state a claim upon which relief can be granted."

in a wrongful death action; and (5) punitive damages are recoverable by parents in an action for damages for loss of society and companionship of a child but not in an action for damages for loss of the minor's earning capacity and medical expenses. We hold that the complaints state a claim for punitive damages in each of these five categories except number (4), the wrongful death action.[2]

We shall turn first to the question of whether punitive damages are recoverable in a product liability action predicated on negligence or strict liability, and we shall turn then to recovery of punitive damages in a survival action, in a wrongful death action, and in an action by a parent for damages resulting from injury to a child.

## II.

Ford Motor Company's argument that punitive damages have no place in product liability cases rests on three grounds: (A) Punitive damages have traditionally been awarded in tort actions in which compensatory damages are premised on defendant's commission of an intentional, personal tort, and recovery of punitive damages should not be allowed in product liability suits in which compensatory damages are premised on the defendant's negligence or on strict liability. (B) The claim for punitive damages characterizing Ford's conduct as willful, deliberate, wanton, malicious, and reckless—all elements of gross negligence—is insufficient because the concept of gross negligence has been abolished in Wisconsin. (C) Punitive damages are unnecessary in prod-

---

[2] Ford maintains that the plaintiffs cannot challenge those parts of the decision of the court of appeals which are adverse to the plaintiffs because the plaintiffs failed to file a notice of cross-appeal. The rules require that a respondent who seeks a modification by the court of appeals of the trial court's judgment or order which is being appealed must file notice of cross-appeal. Rule 809.10, Stats. Rule 809.62, Stats., relating to filing a petition to review an adverse decision by the court of appeals does not require filing a notice of cross-appeal in this court.

uct liability cases to effect punishment and deterrence, which are the objectives of imposing punitive damages in the traditional tort action, and the elimination of punitive damages in all products liability cases is in the public interest because the recovery of punitive damages produces economically and socially undesirable results.

## A.

Ford Motor Company asserts that punitive damages are recoverable only in actions based on intentional, personal torts, and are not recoverable in product liability actions which are grounded in negligence or strict liability. Ford argues that the concept of punitive damages is antithetical to the theories of negligence and strict liability because punitive damages are based on the defendant's intentional conduct. Ford's argument is premised on two assumptions: that intentional conduct is the only conduct justifying punitive damages and that the same facts which justify compensatory damages must be sufficient to justify punitive damages. This court has never adopted this view of punitive damages.

Punitive damages are in the nature of "a demand arising out of a single injurious occurrence," a "theory of relief arising out of the same transaction or occurrence," a "remedy." *Wussow v. Commercial Mechanisms, Inc.*, 97 Wis.2d 136, 143, 293 N.W.2d 897 (of even date herewith). *See also Draeger v. John Lubotsky Motor Sales, Inc.*, 56 Wis.2d 419, 202 N.W.2d 20 (1972).

This court has rested its analysis of punitive damages not on the classification of the underlying tort justifying compensatory damages but on the nature of the wrongdoer's conduct.[3] Although the usual aggravating cir-

---

[3] "When it is recognized that recovery is sought for the tort and not for the breach of contract, the cliches which are relied upon by the defendants—e.g., 'Punitive damages are not allowed for a mere breach of contract'—become irrelevant. The question

cumstances required for the recovery of punitive damages are often found as substantive elements of the tort itself, this court has said a claim for punitive damages may be supported by proof of aggravating circumstances beyond those supporting compensatory damages.

Punitive damages rest on allegations which, if proved, demonstrate a particular kind of conduct on the part of the wrongdoer, which has variously been characterized in our cases as malicious conduct or willful or wanton conduct in reckless disregard of rights or interests.

This court has not required proof of an intentional desire to injure, vex or annoy, or proof of malice, in order to sustain an award for punitive damages. "[M]alice or vindictiveness are not the *sine qua non* of punitive damages." *Kink v. Combs,* 28 Wis.2d 65, 79, 135 N.W.2d 789 (1965). It is sufficient if the injured party shows a reckless indifference to or disregard of the rights of others on the part of the wrongdoer. "Reckless indifference to the rights of others and conscious action in deliberate disregard of them . . . may provide the necessary state of mind to justify punitive damages." 4 Restatement (Second) of Torts sec. 908, comment *b,* p. 465 (1977). Some commentators speak of the behavior justifying punitive damages as "flagrant indifference to the public safety." *Interagency Task Force on Product Liability, Product Liability: Final Report of the Legal Study* (U. S. Dept. of Commerce 1977), vol. 5, p. 137. *See Fahrenberg v. Tengel,* 96 Wis.2d 211, 221, 291 N.W.2d 526 (1980) ; *Anderson v. Continental Ins. Co.,* 85 Wis.2d 675, 697, 271 N.W.2d 368 (1978) ; *Herrmeyer v.*

whether punitive damages are permissible thus is not to be disposed of on grounds that what the plaintiffs assert is a breach-of-contract action, but rather must be considered under a discussion of whether the facts surrounding the tort of bad faith evidence such conduct that punitive or exemplary damages are permissible." *Anderson v. Continental Ins. Co.,* 85 Wis.2d 675, 685–686, 271 N.W.2d 368 (1978).

*Kleeman,* 76 Wis.2d 410, 414, 251 N.W.2d 445 (1977); *Mid-Continent Refrigerator Co. v. Straka,* 47 Wis.2d 739, 744–748, 178 N.W.2d 28 (1970); *Jones v. Fisher,* 42 Wis.2d 209, 218, 219, 166 N.W.2d 175 (1969); *McCormick on Damages* sec. 79, p. 280 (1935); Prosser, *Law of Torts* 10 (4th ed. 1971). "A governing principle of these cases in allowing punitive damages has been the presence of 'circumstances of aggravation' in the tortious injury." *Mid-Continent Refrigerator Co. v. Straka,* 47 Wis.2d 739, 746, 178 N.W.2d 28 (1970). We shall sometimes use the term "outrageous" in this opinion as an abbreviation for the type of conduct which justifies the imposition of punitive damages.

The distinction between the intent necessary to maintain an action for an intentional tort and the frame of mind of the wrongdoer necessary to recover punitive damages was delineated in *Meshane v. Second Street Co.,* 197 Wis. 382, 387, 222 N.W. 320 (1928) as follows:

"Any exact and precise definition of the technical term in law of the 'malice' that must be shown in order that there may be a basis for punitory damages in addition to compensatory damages for a breach of some duty by a defendant when such is the proper subject of an action in tort, is hard to find and still harder to frame. It is evident, however, from all the authorities that in any particular case, not in and of itself a malicious action, in order that punitory damages may be assessed something must be shown over and above the mere breach of duty for which compensatory damages can be given. That is, a showing of a bad intent deserving punishment, or something in the nature of special ill will towards the person injured, or a wanton, deliberate disregard of the particular duty then being breached, or that which resembles gross as distinguished from ordinary negligence." [Quoted with approval in *Mid-Continent Refrigerator Co. v. Straka,* 47 Wis.2d 739, 747, 178 N.W.2d 28 (1970).]

In *Etzminger v. Ford Motor Co.,* 47 Wis.2d 751, 757–758, 177 N.W.2d 899 (1970) this court made clear that

the award of punitive damages depends on the character of the particular conduct in question, not on the mere fact that the defendant's conduct constituted a tort or a crime:

"Punitive damages are not allowed for a mere breach of contract . . . or for all torts or for crimes but generally for those personal torts, which are malicious, outrageous or a wanton disregard of personal rights which require the added sanction of a punitive damage to deter others from committing acts against human dignity . . . ."

In *Anderson v. Continental Ins. Co.*, 85 Wis.2d 675, 697, 271 N.W.2d 368 (1978), we stated that proof of an intentional tort in an action for compensatory damages does not necessarily mean that an award of punitive damages is appropriate.

"We do not conclude, however, that the proof of a bad faith cause of action necessarily makes punitive damages appropriate. Punitive damages are awarded to punish a wrongdoer and to serve as a deterrent. *Mid-Continent Refrigerator Co. v. Straka,* 47 Wis.2d 739, 746, 178 N.W.2d 28 (1970). We pointed out in *Mid-Continent* that punitive damages are to be awarded 'only where the wrong was inflicted "under circumstances of aggravation, insult or cruelty, with vindictiveness or malice," ' (at 747) We also stated therein that there is a distinction between the intent or malice necessary to maintain an action for intentional tort (such as bad faith) and the intent which must be shown to recover punitive damages. For punitive damages to be awarded in addition to compensatory damages for the tort, there must be a showing of an evil intent deserving of punishment or of something in the nature of special ill-will or wanton disregard of duty or gross or outrageous conduct. In the specific context of the intentional tort of bad faith, exemplary damages are not necessarily appropriate although the plaintiff be entitled to compensatory damages. For punitive damages to be awarded, a defendant must not only intentionally have breached his duty of good faith, but in addition must have been guilty of oppression, fraud, or malice in the special sense defined by *Mid-Continent v. Straka.*"

If there is tortious conduct supporting a claim for compensatory damages, we can find no logical or conceptual difficulty in allowing a claim for punitive damages in a negligence or strict liability action if the plaintiff is able to establish the elements of "outrageous" conduct justifying punitive damages. A similar conclusion has been reached in the Final Report of the Legal Study of the Interagency Task Force on Product Liability, vol. 5, pp. 117–118, and in the reported cases of other jurisdictions which have considered the issue of recovery of punitive damages in product liability actions.[4]

The Alaska Supreme Court, in responding to a defendant's contention that punitive damages have no place in the "fault-free" context of strict products liability, reached the same conclusion as we do, saying:

"We also reject the argument that punitive damages have no place in a strict liability case, although we do agree with appellant that punitive damages ought not be awarded in every products liability case. Where, however, as in the instant case, plaintiff is able to plead and

[4] *See, d'Hedouville v. Pioneer Hotel Co.*, 552 F.2d 886 (9th Cir. 1977); *Gillham v. The Admiral Corp.*, 523 F.2d 102 (6th Cir. 1975), *cert. denied*, 424 U.S. 913 (1976); *Moore v. Jewel Tea Co.*, 116 Ill. App.2d 109, 253 N.E.2d 636 (1969); 46 Ill.2d 788, 263 N.E.2d 103 (1970); *Johnson v. Huskey Industries*, 536 F.2d 645 (6th Cir. 1976); and cases cited in Annot. *Allowance of Punitive Damages in Products Liability Case*, 29 A.L.R.3d 1021, 1022 (1970), and Supplemental Cases.

In *Drake v. Wham-O Manufacturing Company*, 373 F. Supp. 608 (E.D. Wis. 1974), Judge Gordon concluded that punitive damages were "arguably" allowable under Wisconsin law where strict liability in tort is claimed. In *Walbrun v. Berkel, Inc.*, 433 F. Supp. 384 (E.D. Wis. 1976), Judge Warren held to the contrary. The *Walbrun* case may be the only reported case to date which held that as a matter of law punitive damages are not recoverable in product liability cases. Ghiardi & Koehn, *Punitive Damages in Strict Liability Cases*, 61 Marq. L. Rev. 245, 251 (1977), recommended that punitive damages not be allowed in product liability suits in this state.

prove that the manufacturer knew that its product was defectively designed and that injuries and deaths had resulted from the design defect, but continued to market the product in reckless disregard of the public's safety, punitive damages may be awarded. *See, e.g., Gillham v. The Admiral Corporation,* 523 F.2d 102 (6th Cir. 1975), *cert. denied,* 424 U.S. 913, 96 S. Ct. 1113, 476 L. Ed.2d 318 (1976) ; *Toole v. Richardson-Merrell, Inc.,* 251 Cal. App.2d 689, 60 Cal. Rptr. 398 (1967) ; *Moore v. Jewel Tea Company,* 116 Ill. App.2d 109, 253 N.E.2d 636 (1969), *aff'd* 46 Ill.2d 288, 263 N.E.2d 103 (1970)." *Sturm, Ruger & Co., Inc. v. Day,* 594 P.2d 38, 46, 47 (Alaska 1979).

This court rejects Ford's argument that as a matter of law, punitive damages cannot be recovered in any product liability case based on strict liability or negligence. We hold that punitive damages are recoverable in a product liability suit if there is proof that the defendant's conduct was "outrageous." Awarding punitive damages in a product liability case is a natural, direct outgrowth of basic common law concepts of tort law and punitive damages.[5]

---

[5] *Bielski v. Schulze,* 16 Wis.2d 1, 11, 114 N.W.2d 105 (1962) : "Inherent in the common law is a dynamic principle which allows it to grow and to tailor itself to meet changing needs within the doctrine of *stare decisis,* which, if correctly understood, was not static and did not forever prevent the courts from reversing themselves or from applying principles of common law to new situations as the need arose.[13] If this were not so, we must succumb to a rule that a judge should let others 'long dead and unaware of the problems of the age in which he lives, do his thinking for him.' Mr. Justice DOUGLAS, Stare Decisis, 49 Columbia Law Review (1949), 735, 736. . . ."

---

"[13] *Schwanke v. Garlt* (1935), 219 Wis. 367, 263 N.W. 176; *Metropolitan Casualty Ins. Co. v. Clark* (1911), 145 Wis. 181, 129 N.W. 1065; *Dimick v. Schiedt* (1935), 293 U.S. 474, 55 Sup. Ct. 296, 79 L. Ed. 603; *Funk v. United States* (1933), 290 U.S. 371, 54 Sup. Ct. 212, 78 L. Ed. 369."

## B.

Ford also contends that allowing recovery of punitive damages on the allegations of this complaint is inconsistent with this court's abolition of the doctrine of gross negligence in *Bielski v. Schulze,* 16 Wis.2d 1, 114 N.W.2d 105 (1962), and undermines the basic concept of comparative negligence. Prior to *Bielski,* the most important consequence of a finding of gross negligence on the part of a defendant was that a plaintiff could recover 100 percent of his compensatory damages, even if the plaintiff had been guilty of a great degree of contributory negligence. This aspect of the doctrine of gross negligence was eliminated by this court in *Bielski* by the abolition of the concept of gross negligence in negligence actions. In *Bielski,* 16 Wis.2d at 18, the court commented on punitive damages in negligence cases as follows:

". . . We recognize the abolition of gross negligence does away with the basis for punitive damages in negligence cases. But punitive damages are given, not to compensate the plaintiff for his injury but to punish and deter the tortfeasor, and were acquired by gross negligence as accoutrements of intentional torts. Wilful and intentional torts, of course, still exist, but should not be confused with negligence. See sec. 481, p. 1260, Restatement, 2 Torts. The protection of the public from such conduct or from reckless, wanton, or wilful conduct is best served by the criminal laws of the state."

This dicta in *Bielski* relating to punitive damages in negligence cases is subject to various interpretations. Ford asserts that it means that punitive damages are not recoverable in any negligence action. In *Cieslewicz v. Mutual Service Cas. Ins. Co.,* 84 Wis.2d 91, 267 N.W. 2d 595 (1978), this court commented on the *Bielski* dicta and concluded that whether punitive damages are recoverable in a negligence action is an open question:

"We note that it is an open question whether punitive damages may be awarded in Wisconsin in the context

of a negligent tort. When we abolished the doctrine of gross negligence in *Bielski v. Schulze,* 16 Wis.2d 1, 18, 114 N.W.2d 105 (1962), we used language that can be read as suggesting that punitive damages are inappropriate in negligence cases. The commentators, however, have not read this language as precluding punitive damages in those cases. Walther & Plein, *Punitive Damages: A Critical Analysis:* Kink v. Combs, 49 Marq. L. Rev. 369, 374 (1965); Ghiardi, *supra,* 60 Marq. L. Rev. at 758." *Cieslewicz, supra,* 84 Wis.2d at 101 n. 4.

Attorney David Walther and Thomas Plein, in their article *Punitive Damages: A Critical Analysis: Kink v. Combs,* 49 Marq. L. Rev. 369, 374 (1965), commented on the *Bielski* dicta as follows:

". . . Because gross negligence involved a willful and wanton disregard of the rights of the plaintiff, one could argue that since the concept of gross negligence has been abolished punitive damages can no longer be recovered in negligence cases. In the *Bielski* decision the Court used language to this effect. Although the Court set forth the classic argument against punitive damages therein, it is unlikely that the court intended to restrict punitive damages to intentional torts exclusively. It is likely that punitive damages are still available in negligence cases where defendant's conduct was willful and wanton."

Professor Ghiardi apparently agreed with the Walther-Plein analysis of the *Bielski* dicta and commented:

". . . Notwithstanding the court's statement it is likely that punitive damages can be recovered in cases where the defendant's conduct amounts to what was formerly categorized as gross negligence; that is where defendant has acted in wanton, wilful, or reckless disregard of the plaintiff's rights." Ghiardi, *Punitive Damages in Wisconsin,* 60 Marq. L. Rev. 753, 758 (1977).

Although in *Bielski* the court indicated that the public protection from reckless, wanton or wilful conduct is best served by the state's criminal laws, the court soon rejected this rationale in *Kink v. Combs, supra,* 28 Wis.2d at 80, where it stated:

"Suffice it to say that whatever shortcomings the award of punitive damages may have, nevertheless, it must be remembered that it has the effect of bringing to punishment types of conduct that though oppressive and hurtful to the individual almost invariably go unpunished by the public prosecutor."

In *Kink v. Combs* and in subsequent cases this court has described the character of the conduct which will support punitive damages in language similar to that sometimes used to describe gross negligence. Although we recognize the similarity of language we need not decide, at this time, whether the behavior or acts which permit an award of punitive damages are the precise equivalent of conduct falling within the old gross negligence concept.[6] In *Bielski,* the court pointed out that "gross negligence" was a "contradiction in terms" since it did not really describe negligence at all, but rather "a willingness to harm although such harm may not have been intended," or "willingness to perpetrate injury," or "a purpose to take known chances of perpetrating an injury" (16 Wis.2d at 14, 15). The court concluded, "ordinary negligence lay in the field of inadvertence but gross negligence in the field of *actual or constructive intent to injure* . . . ." *(Id.,* at 15, emphasis supplied.)

As Professor Ghiardi noted, "[w]hile *Bielski* abolished the doctrine of gross negligence as a legal doctrine, in fact wanton, wilful or reckless conduct still exists." 60 Marq. L. Rev. 753, 759. And this court has recognized that such conduct subjects the wrongdoer to the possibility of punitive damages saying:

"The defendant claims that the question of punitive or exemplary damages should not have been submitted to the jury because defendant's acts were not activated by malice or vindictiveness. However, malice or vindictiveness are not the *sine qua non* of punitive damages.

---

[6] Prosser compares the meaning assigned to willful, wanton or reckless conduct and the concept of gross negligence. Prosser, *Torts* sec. 34, p. 185 (4th ed. 1971).

" 'Where the defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime, all but a few courts have permitted the jury to award in the tort action "punitive" or "exemplary" damages, or what is sometimes called "smart money." ' Prosser, Law of Torts (2d ed.), p. 9, sec. 2.

"For the award of punitive damages it is sufficient that there be a showing of wanton, wilful, or reckless disregard of the plaintiff's rights. 6 C. J. S., Assault and Battery, p. 904, sec. 55b(3). . . ." *Kink v. Combs, supra,* 28 Wis.2d at 79.

Because punitive damages depend on the nature of the wrongdoer's conduct, not on the nature of the tort on which compensatory damage is based, we interpret the dicta in *Bielski* to mean that punitive damages are not recoverable if the wrongdoer's conduct is merely negligent. Punitive damages do not rise from negligence. Nor does every products liability case give rise to punitive damages. Only where there is proof of malice or willful, wanton, reckless disregard of plaintiff's rights can punitive damages be considered. Although *Bielski* eliminated the proof of aggravated conduct characterized as gross negligence in determining liability for compensatory damages and the amount thereof in negligence actions, *Bielski* has not been interpreted by this court as eliminating such conduct as the basis for punitive damages. We do not read *Bielski* as holding that "outrageous" conduct, which may also fit the description of "gross negligence," has no place in determining the existence of liability for punitive damages and in determining the amount of punitive damages in a product liability tort action. To the extent that the dicta quoted from *Bielski* can be interpreted otherwise, we reject such an interpretation.[7]

---

[7] Several commentators have interpreted *Bielski* to abolish the concept of punitive damages in a negligence case and have ex-

Ford argues that allowing punitive damages in a comparative negligence case will undermine the trial of the comparative negligence issues. A claim for punitive damages in a products liability case permits the intro-

pressed dissatisfaction with such an interpretation of *Bielski.* Woods, *The Negligence Case: Comparative Fault* sec. 7.5, pp. 163–164 (1978), stated:

"The Wisconsin decision is difficult to defend. There is no relationship between the rationale for imposing punitive damages and the concept of comparative negligence. It seems hardly probable that the courts and legislature in adopting comparative negligence have intended to erase the case law on punitive damages."

Professor Schwartz, in *Comparative Negligence* sec. 5.4, pp. 110–111 (1974), commented on *Bielski* as follows:

"The general proposition that enactment of a comparative negligence law does not abolish punitive damages for defendant's 'aggravated negligence' finds an exception in Wisconsin. In Bielski v. Schulze, the Supreme Court of that state appears to have abolished the concept of aggravated negligence for all purposes; this included doing away 'with the basis for punitive damages in negligence cases.' . . . In sum, the law of punitive damages and the law of comparative negligence are separate and should be so considered by the courts—despite the ruling in Bielski v. Schulze."

Law Review commentators similarly concluded that the concept of gross negligence in a claim for compensatory damages involving comparative negligence must be distinguished from the concept of "outrageous" conduct in a claim for punitive damages.

"A final problem related to willful, wanton, or reckless conduct is the effect of the policy of permitting punitive damages where the defendant is guilty of negligence so gross as to be reckless or criminal. It has been suggested that the rule relating to punitive damages should not be affected by the comparative negligence rule. This is the position assumed by most jurisdictions which have considered the problem, and it is a sound one when one understands that comparative negligence is a method of providing compensation to the plaintiff, whereas the imposition of punitive damages is intended to be a punishment and a deterrent to the defendant. That the basis for each is different would seem to support a conclusion that the one should not affect the other." Williams & Davidson, *Kaatz v. State: The Rule of Comparative Negligence Afloat Upon Unchartered Alaskan Waters,* 6 U.C.L.A. Alaska L. Rev. 175, 188, 189 (1977).

duction of evidence relating to the wealth of the defendant, prior punitive damages awarded against the defendant, and anticipated profits of the defendant. Ford contends that this evidence is highly prejudicial to the defendant when the fact finder determines the issues of liability and compensatory damages and that the evidence introduced concerning punitive damages will distort the jury's verdict. Commentators are quick to respond to this assertion by pointing out that the reason for awarding punitive damages is that it is generally recognized that if punitive damages are not allowed, juries give vent to their desire to punish the wrongdoer under the guise of increasing the compensatory damages, particularly those awarded for pain and suffering. 2 Harper & James, *Law of Torts*, sec. 25.1, p. 1300 (1956). A classic example of this phenomenon is a Wisconsin case which was tried three times before different juries in different counties, twice with punitive damages allowed and once without; each verdict was for the same total amount. *Bass v. Chicago & N.W. Ry.*, 36 Wis. 450 (1874) ($4,500 including both punitive and compensatory damages); 39 Wis. 636 (1876) ($4,500 compensatory); 42 Wis. 654, 667–72 (1877) ($2,500 compensatory, $2,000 punitive). The danger of prejudicing the jury by allowing a claim for the punitive damages is not peculiar to product liability cases; it exists in any case involving punitive damages.

We conclude that permitting the award of punitive damages in product liability cases is not inconsistent with *Bielski* and does not undermine the law of comparative negligence.

## C.

Ford maintains that punitive damages are unnecessary in product liability cases to effect punishment and deterrence, which are the objectives of imposing punitive

damages in the traditional tort action and that our outlawing punitive damages in all products liability cases is in the public interest because the recovery of punitive damages would cause economically and socially undesirable consequences.

## 1.

Ford does not assert that there are no valid policy grounds for awarding punitive damages. Ford does not urge the complete abolition of punitive damages in all tort cases. Ford merely asserts that the accepted justifications for punitive damages, namely, punishment and deterrence, have no application in the product liability context.

In light of the history of punitive damages in Wisconsin, it is understandable why Ford is not urging the abolition of punitive damages in all tort cases. For nearly 126 years the Wisconsin courts have accepted punitive damages as part of Wisconsin tort law. In 1854, the Wisconsin Supreme Court, after carefully reviewing policy considerations militating both for and against the award of punitive damages, adopted the concept of assessing punitive damages to punish the wrongdoer and to deter the wrongdoer and others from similar conduct in the future. *McWilliams v. Bragg,* 3 Wis. 377 (*424) (1854).[8] The issue of punitive damages

---

[8] Punitive damages have deep roots in ancient law, and first appeared in English common law during the eighteenth century. The concept of punitive damages became well accepted as part of the common law of many states in the nineteenth century. Apparently only four states have entirely rejected the doctrine, and no state has rejected the doctrine by statute. *see* Note, *Exemplary Damages in the Law of Torts,* 70 Harv. L. Rev. 517 (1957); *Interagency Task Force on Product Liability, Product Liability: Final Report of the Legal Study* (U.S. Dept. of Commerce 1977), vol. 5, p. 131 n. 1.

Although awarding punitive damages is a well-established concept in the American legal system, punitive damages have been

was raised in numerous cases in the nineteenth century, and this court, while recognizing the problems inherent in awarding punitive damages, repeatedly reaffirmed its adherence to the concept of punitive damages as a valuable tool in the law. In 1877, Chief Justice Ryan, in *Bass v. Chicago & Northwestern Ry. Co.*, 42 Wis. 654, 672 (1877), although questioning the wisdom of the rule of punitive damages, concluded that the policy was too well established in Wisconsin to be overturned by judicial decision. The Chief Justice, in his concurring opinion, commented:

"I have always regretted that this court adopted the rule of punitory damages in actions of tort. In the controversy between Prof. Greenleaf and Mr. Sedgwick, I cannot but think that the former was right in principle, though the weight of authority may be with the latter. It is difficult on principle to understand why, when the sufferer by a tort has been fully compensated for his suffering, he should recover anything more. And it is equally difficult to understand why, if the tortfeasor is to be punished by exemplary damages, they should go to the compensated sufferer, and not to the public in whose behalf he is punished. . . . But the rule was adopted as long ago as 1854, in *McWilliams v. Bragg*, 3 Wis., 424, and has been repeatedly affirmed since. It is therefore too late to overturn it by judicial decision. That could well be done now by legislative enactment only."

Although controversy continues to surround the doctrine of punitive damages in the twentieth century, and although some have questioned whether tort law—which is designed to compensate an injured plaintiff—should also serve the function of the criminal law, *i.e.*, to punish a defendant for the purpose of deterring him and others

a subject of a great deal of debate. The opposing views were set forth in the nineteenth century by Professor Greenleaf in his *Treatise on Evidence* and Professor Sedgwick in his work entitled *Measure of Damages* and are referred to in the *McWilliams* case, *supra.*

from further offenses, this court has consistently and frequently said that punishment and deterrence are important considerations in the law of torts in Wisconsin. We explained our position in *Luther v. Shaw*, 157 Wis. 234, 238–239, 147 N.W. 18 (1914) as follows:

". . . From the doctrinaire viewpoint and assuming as premises that damages should never exceed compensation and that every mulct imposed as a punishment or deterrent should go into the public treasury, the award of such damages to the plaintiff in a private prosecution would seem to be illogical.

"Speaking for myself only in this paragraph, I am inclined to admit that, assuming these premises, the lack of logic is quite apparent. But it is a commonplace observation that illogical systems of government often achieve better results than those which are strictly logical. The law giving exemplary damages is an outgrowth of the English love of liberty regulated by law. It tends to elevate the jury as a responsible instrument of government, discourages private reprisals, restrains the strong, influential, and unscrupulous, vindicates the right of the weak, and encourages recourse to and confidence in the courts of law by those wronged or oppressed by acts or practices not cognizable in or not sufficiently punished by the criminal law. The latter law must be uniform as to persons and acts, must fix a maximum and minimum punishment on this basis, and cannot always be adjusted to particular circumstances of atrocity which occasionally occur. The maximum penalty, together with compensatory damages for the wrongful taking of one little ewe lamb, would be quite inadequate and unsatisfactory in the hypothetical case put by Nathan to David. If some American multimillionaire should emulate the antics of Lucius Veratius with reference to personal or property rights, justice might require some deterrent not found in the criminal-law penalties plus compensatory damages. The ordinary case of aggravated newspaper libel where the actual damages are small, or the case of malicious abuse of legal process, will supply more modern instances."

In *Kink v. Combs*, 28 Wis.2d 65, 80–81, 135 N.W.2d 789 (1965), we continued our adherence to the principle

of punitive damages as a valuable and effective tool in the control of human conduct saying:

"Suffice it to say that whatever shortcomings the award of punitive damages may have, nevertheless, it must be remembered that it has the effect of bringing to punishment types of conduct that though oppressive and hurtful to the individual almost invariably go unpunished by the public prosecutor. Under the law of Wisconsin (sec. 59.47(2), Stats.), a district attorney is not obliged to prosecute an assault and battery and may leave the injured party to prosecute through his own attorney. Certainly, the criminal law seldom reaches an assault and battery case. By allowing punitive damages the self-interest of the plaintiff will lead to prosecution of the claim, while the same self-interest of the plaintiff would lead him to refrain from instituting a criminal action at his own expense. Punitive damages serve not only the aggrieved victim of an assault, but also society, for by this device, a quasi-criminal action is prosecuted, when ordinarily it would not be prosecuted at all. The multiple-damage suits countenanced by our statutes recognize the principle that certain types of violations will not be prosecuted unless the injured parties' judgment is fattened by the equivalent of punitive damages. These are civil actions (*e.g.,* antitrust suits) where the public interest is served by the incentive given to private litigation. Certainly the consolidation of claims for compensation and punitive damages in one cause of action is in accord with modern principles of avoiding multiple trials.

"This court takes the position that punitive damages do serve as a deterrent. . . ."

This court, although requested to do so, has not been willing to abandon the concept of punitive damages and has on numerous occasions reaffirmed its adherence to the doctrine. *Templeton v. Graves,* 59 Wis. 95, 17 N.W. 672 (1883); *Lisowski v. Chenenoff,* 37 Wis. 2d 610, 633–635, 155 N.W.2d 619 (1968); *Jones v. Fisher,* 42 Wis.2d 209, 218, 166 N.W.2d 175 (1969) (*see* dissent challenging the doctrine, 42 Wis.2d at 222); *Fahren-*

*berg v. Tengel,* 96 Wis.2d 211, 291 N.W.2d 516 (1980).

In *Entzminger v. Ford Motor Co.,* 47 Wis.2d 751, 758, 177 N.W.2d 899 (1970), this court said that "despite repeated criticism of the punitive damage rule, this court has adhered to it but has refused to extend the doctrine." Nevertheless, this court has extended the doctrine. *See Kink v. Combs,* 28 Wis.2d 65, 135 N.W.2d 789 (1965); *Anderson v. Continental Ins. Co.,* 85 Wis.2d 675, 271 N.W.2d 368 (1978). The doctrine of punitive damages was adopted through the Wisconsin judicial process and has grown through the common law process. "The common law is not immutable, but flexible, and upon its own principles adapts itself to varying conditions." *Dimick v. Schiedt,* 293 U.S. 474, 487 (1935), quoted with approval *Schwanke v. Garlt,* 219 Wis. 367, 371, 263 N.W. 176 (1935).[9]

We must acknowledge, and Ford does not argue otherwise, that there are several documented instances of manufacturers who knowingly or recklessly breached the tort rules of product safety.

In *Sturm, Ruger & Co., Inc. v. Day,* 594 P.2d 39, 47 (Alaska 1979), the evidence presented at trial indicated that top officials at Sturm, Ruger knew that the safety and loading notches of their single action revolver presented a danger of accidental discharge because of the propensity of the engaging middle parts to fail or break; that the management of Sturm, Ruger knew that serious injuries had resulted from this deficiency; and that the management procrastinated in changing the basic design, at an increased cost of $1.93 per gun.

In *Gillham v. Admiral Corporation,* 523 F.2d 102, 106, 107 (6th Cir. 1975), the evidence at trial disclosed that fires originated in Admiral color television sets, that Admiral Corporation received a steady stream of complaints about TV set fires, and that Admiral could

---

[9] See note 5, *supra.*

have remedied the defect and failed to do so. To quote the Missouri Court of Appeals:

"The evidence also disclosed that Admiral could feasibly have reduced this fire hazard substantially, or have eliminated it completely. Materials superior to the paper and wax were available for use as insulation in high voltage transformers long before Admiral designed its transformer in 1963, and these materials were used by other television manufacturers before 1963. Also, Admiral could have installed a fuse in the high voltage circuitry to cut off the electricity in the event of overheating.

"The evidence thus demonstrated that when Admiral designed, manufactured and marketed appellant's television set it knew that the set presented a serious fire hazard. Nevertheless, Admiral did not warn prospective purchasers or owners of the danger despite the steady flow of reported fires originating in Admiral color television sets. Nor did Admiral redesign this model or stop marketing it during the period in question.

"The evidence also disclosed that the highest officials of Admiral were aware of the fire hazard and its precise source and cause. . . . Moreover, there was evidence that Admiral officials sought to deceive customers about the fire hazard presented by the color television sets."

In light of this court's repeated reaffirmation of the concept of punitive damages as a civil deterrent to "outrageous" behavior, and because apparently some businesses have found it in their interests to operate with reckless disregard to consumer safety, this court cannot, in good conscience, prohibit punitive damages in all product liability cases unless there is a strong showing that such prohibition is in the public interest.[10]

Ford, recognizing that the law of punitive damages and product liability are largely judge-made law, and that the Wisconsin legislature has had little involvement in the

[10] For a discussion of punitive damages, see, e.g., Dobbs, *Law of Remedies* sec. 3.9 (1973); Prosser, *Law of Torts* 9-14 (4th

development of this law,[11] argues that this court should, as a matter of public policy, eliminate punitive damages in product liability cases because punitive damages are not needed in product liability cases to effect punishment and deterrence, which are the objectives of imposing punitive

ed. 1971); McCormick, *Law of Damages* ch. 10 (1935); Ghiardi, *Personal Injury Damages* chs. 2, 3 (Wis. Current Law Series 1964); 4 *Restatement of Torts* (Second) sec. 908 (1977); Mallor & Roberts, *Punitive Damages: Toward A Principled Approach,* 31 Hastings L.J. 639 (1980); Fulton, *Punitive Damages in Product Liability Cases,* 15 The Forum 117 (1979); Ghiardi & Koehn, *Punitive Damages in Strict Liability Cases,* 61 Marq. L. Rev. 245 (1977); Ghiardi, *Punitive Damages in Wisconsin,* 60 Marq. L. Rev. 753 (1977); Riley, *Punitive Damages: The Doctrine of Just Enrichment,* 27 Drake L. Rev. 195 (1977); Snyman, *The Validity of Punitive Damages in Products Liability Cases,* 44 Ins. Counsel J. 402 (1977); Sullivan, *Punitive Damages in the Law of Contract: The Reality and the Illusion of Legal Change,* 61 Minn. L. Rev. 207 (1977); Owen, *Punitive Damages in Products Liability Litigation,* 74 Mich. L. Rev. 1257 (1976); Tozer, *Punitive Damages and Products Liability,* 39 Ins. Counsel J. 300 (1972); Rice, *Exemplary Damages in Private Consumer Actions,* 55 Iowa L. Rev. 307 (1969); Sullivan, *Punitive Damages Related to Multiple Litigation Against a Corporation,* 16 Fed. of Ins. Counsel Q. 91, No. 3 (1966); Walther & Plein, *Punitive Damages: A Critical* Analysis: Kink v. Combs, 49 Marq. L. Rev. 369 (1965); Morris, *Punitive Damages in Personal Injury Cases,* 21 Ohio St. L.J. 216 (1960); Wickhem, *The Rule of Exemplary Damages in Wisconsin,* 2 Wis. L. Rev. 129 (1923); Note, *Punitive Damages in Products Liability Cases,* 16 Santa Clara L. Rev. 895, 909 (1976); Note, *Allowance of Punitive Damages in Products Liability Claims,* 6 Ga. L. Rev. 613 (1972); Note, *The Imposition of Punishment by Civil Courts: A Reappraisal of Punitive Damages,* 41 N.Y.U.L. Rev. 1158 (1966) Note, *Punitive Damages and Their Possible Application in Automobile Accident Litigation,* 46 Va. L. Rev. 1036 (1960); Note, *Exemplary Damages in the Law of Torts,* 70 Harv. L. Rev. 517 (1957).

For an analytical bibliography of Products Liability: 1970 to August 1978, *see* Murphy, Grad & Santagata, *Analyzing Products Liability: Interim Report to the National Chamber Foundation* (Sept. 30, 1978), Appendix A.

[11] Wis. Legisl. Council, *Product Liability: An Overview* 29 (RB 78–3 1978).

damages in the traditional tort action, and because our outlawing punitive damages in all product liability cases is in the public interest because the recovery of such damages would cause undesirable economic and social consequences.

## 2.

Ford asserts that in product liability cases compensation damages operate as a substantial punishment and deterrence against the manufacture and distribution of unreasonably unsafe products and that punitive damages are not necessary. Ford contends that product liability cases differ in nature from the traditional punitive damage tort case in which generally only one plaintiff is involved and in which compensatory damages are relatively small. In product liability cases there are potentially many plaintiffs who will recover compensatory damages. Ford maintains that there has been a substantial increase in the number of product liability cases brought and the amount of damages awarded; that Ford is exposed to multiple, substantial compensatory damage awards; and that the cost of paying products liability claims and buying products liability insurance has become a significant cost of doing business.

The counterargument, which is frequently made to Ford's argument and which we find persuasive, is that the need for punitive damages may be particularly appropriate in a product liability case because mere compensatory damages might be insufficient to deter the defendant from further wrongdoing. Some may think it cheaper to pay damages or a forfeiture than to change a business practice.[12] In *Funk v. Kerbaugh,* 222 Pa. 18, 70 A. 953,

---

[12] "In the calculation of his expected profits, the wrongdoer is likely to allow for a certain amount of money which will have to be returned to those victims who object too vigorously, and he will be perfectly content to bear the additional cost of litigation

954 (1908), the defendant wilfully carried out blasting in such a way as to damage buildings belonging to the plaintiff "because it was cheaper to pay damages . . . than to do work in a different way." The possibility of the manufacturer paying out more than compensatory damages might very well deter those who would consciously engage in wrongful practices and who would set aside a certain amount of money to compensate the injured consumer. Punishment of manufacturers guilty of intentional or reckless breaches of their obligation by imposing punitive damages might diminish the profitability of misconduct and any unfair competitive advantages such manufacturers might otherwise have.

Ford further argues that, in product liability cases, unlike in the traditional punitive damage tort case, substantial deterrence is provided by pervasive federal regulations of product quality and by the threat of substantial federal, civil ($400,000 and $1,500,000 are figures cited by Ford) and criminal penalties ($50,000 and imprisonment are cited by Ford) under various federal statutes. The problem with the argument is that it is made to support Ford's position that punitive damages should be abolished in all product liability cases, not only those involving auto manufacturers. Yet manufacturers of products other than autos may not be subject to the same intensive and extensive regulation as auto manufacturers. And although Ford argues for reliance on administrative controls in this arena, in other arenas businesses understandably argue that they are being overregulated and urge that they be permitted to operate in a marketplace free of government regulation.

---

as the price for continuing his illicit business. It stands to reason that the chances of deterring him are materially increased by subjecting him to the payment of punitive damages." *Walker v. Sheldon,* 10 N.Y.2d 401, 406, 179 N.E.2d 497, 499, 223 N.Y.S.2d 488, 492 (1961).

Furthermore, Ford offers no hard data to support its position that federal administrative sanctions or judicial sanctions are being vigorously pursued and are adequate deterrents. Even if Ford had such data, the submission would be more appropriate at the trial level than in this court. These data are relevant in attempting to persuade the fact-finder not to impose punitive damages or to bring in a small award.

Ford also argues that punitive damages in a product liability case, unlike in the traditional punitive damage tort case, would not serve the purposes of punishment and deterrence because the public, not the manufacturer, would pay the damages through higher prices for goods.[13] We recognize, as did the court of appeals, an inconsistency between the concept of punitive damages as a deterrent and the possibility that punitive damages can be passed on to consumers as a cost of production. This court adopted strict liability in tort in product liability cases partly because "the seller is in the paramount position to distribute the costs of the risks created by the defective product he is selling. He may pass the cost on to the consumer via increased prices." *Dippel v. Sciano*, 37 Wis.2d 443, 450, 155 N.W.2d 55 (1967). Manufacturers are, however, not always able to pass on to

[13] This court has not decided whether it is contrary to public policy to enforce a contract which insures against liability for punitive damages. *Cieslewicz v. Mutual Service Cas. Ins. Co.*, 84Wis.2d 91, 93, 267 N.W.2d 595 (1978), held that a homeowner's liability policy which covers "all sums which the Insured shall become legally obligated to pay as damages because of bodily injury" obligated the insurer to pay statutory treble damages. The court found that the distinctions between multiple damages imposed by law and punitive damages imposed by common law permitted the conclusion that the risk against multiple damages is insurable without deciding whether public policy prevents insuring against punitive damages. We need not consider in this case the question whether the cost of punitive damages may be spread by the device of expensing the risk through insurance premiums.

their customers all costs, including multiple punitive damage awards. Ford's contention was ably refuted by the circuit court for Eau Claire county, the Honorable Thomas H. Barland, Circuit Judge, in *Barager v. Ford Motor Co.* (Memorandum Decision dated September 15, 1977, in circuit court case No. 76 CV 215), on appeal to this court, case No. 77–274. The *Barager* case, like the instant case, presents the issue whether punitive damages can be claimed in a product liability case. Judge Barland stated:

"Finally, Ford argues that even if punitive damages were awarded against it, it would not be punished because it would merely pass on the cost of doing business. That argument flies in the face of all the statements in Ford's annual reports and quarterly statements regarding competitive pricing. It does not follow under economic logic that a punitive damage award will be passed on in whole or in part as a cost of doing business. It may or may not, depending upon Ford's price standing in relation to its competitors and its own financial condition. It could mean lower profits for Ford. It could result in stockholder complaints about a lower profit margin because of punitive damage awards for unsafe cars, thereby spurring Ford on to exercise more care in the safe design of its automobiles. It could result in a greater scrutiny by Ford's management of its auto design from the safety standpoint. All of these changes, with the exception of lower profits or higher costs, if they were to take place, would benefit the public as a whole."

Ford observes that a frequently given justification for punitive damages in the traditional punitive damage tort case is that they encourage redress of wrongs that might otherwise go unpunished; punitive damages provide an incentive to the injured party to sue. Ford argues that punitive damages are wholly unnecessary to encourage the bringing of claims in product liability cases, because compensatory damages provide sufficient incentive to the victim of a product accident to proceed

with his claim for compensatory damages. Ford may be right for those instances where injuries are very severe, but is probably wrong for the many product liability cases where injuries are moderate or minor. But even if the injury to each individual is not severe, there is a public need to deter the production of unreasonably unsafe products, and the availability of punitive damages increases the likelihood that the injured customer will sue for recovery.

In summary, we are not persuaded by Ford's argument that punitive damages are unnecessary in product liability cases to effect punishment or deterrence, the objectives of imposing punitive damages in the traditional tort action.

### 3.

Ford further argues that it is in the public interest for this court to outlaw punitive damages in all product liability cases because allowing the recovery of punitive damages would cause undesirable economic and social consequences.

Ford adopts, to a large extent, the policy objections to allowing punitive damages in a product liability case which were set forth by Judge Friendly in *Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832 (2d Cir. 1967). It should be pointed out, however, that Judge Friendly's expressions of concern were *dicta*, because he concluded that the law of New York permitted the imposition of punitive damages in a product liability case.[14] Pro-

---

[14] Dealing with the same defendant, the same drug, and the same course of conduct, the California court in *Toole v. Richardson-Merrell, Inc.*, 251 Cal. App.2d 689, 60 Cal. Rptr. 398 (1967), aware of the decision in *Roginsky v. Richardson-Merrell*, 378 F.2d 832 (2d Cir. 1967), affirmed a $500,000 punitive damages award to the plaintiff where sec. 3294 of the California Civil Code allowed punitive damages in the presence of "oppression, fraud or malice."

fessor Owen, in his persuasive article entitled *Punitive Damages in Products Liability Litigation,* 74 Mich. L. Rev. 1258 (1976), systematically examines and refutes the many arguments which have been raised against punitive damages in products liability cases.[15] We shall deal briefly with each of Ford's policy arguments.

[15] Professor David G. Owen concludes in *Punitive Damages in Products Liability Litigation,* 74 Mich. L. Rev. 1257, 1259–1260, 1295 (1976), that punitive damages should be recoverable in product liability cases, saying:

"The strict liability theory of modern products liability law explicitly addresses the loss distribution problems that arise when an injury is caused by a defective product marketed by an 'innocent' manufacturer, since liability is imposed even though the manufacturer has exercised due care. But the principles of strict liability are ill-equipped to deal with problems at the other end of the culpability scale where an injury results when a manufacturer markets its products in intentional or reckless disregard for consumer safety. Nor has the criminal law filled this void. A legal tool is needed that will help to expose this type of gross misconduct, punish those manufacturers guilty of such flagrant misbehavior, and deter all manufacturers from acting with similar disregard for the public welfare. The punitive damages remedy is such a tool.

". . .

"Regardless of what actually motivates a manufacturer to market a product known to be defective, such conduct amounts to a conscious [flouting] of the law. If public confidence in the legal system is to be maintained, remedies must be developed that will punish and deter flagrant breaches of the rules of behavior. This is particularly so when violations expose consumers to unreasonable risks of personal injury and are motivated solely by the manufacturer's desire for increased profits. The doctrine of punitive damages well serves this purpose in the products liability context. If manufacturers are punished for such conduct by punitive damages assessments, compliance with the safety rules should be increased as profits are reduced. As manufacturers market safer products to avoid increased penalties, managerial determinations of optimal product safety should begin more nearly to approximate that determination embodied in the common-law rules of products liability." (Footnotes omitted.)

Ford argues that if the punitive damages are not passed on to the consumer the innocent shareholder bears the burden. But the loss of investment and the decline in value of investments are risks which investors knowingly undertake, and investors should not enjoy ill-gotten gains. There is a public interest in encouraging shareholders and corporate management to exercise closer control over the operations of the entity, and the imposition of punitive damages may serve this interest.[16]

Ford argues that as a practical matter there will be a limit to the amount of punitive damages a manufacturer can pay and to the number of times a manufacturer will be—or should be—punished for the same product. Thus the injured parties who win the race to the courthouse reap "the bonanza of punitive damages." The later plaintiffs may receive little or no punitive damages. Ford further asserts that punitive damages are a windfall to the injured party and, if they are to be awarded, they should be awarded to the public. Although Ford's arguments have a certain equitable ring to them, we should not be sidetracked by them. Ford would solve the inequity of awarding punitive

---

[16] We need not at this time set forth any rule governing the corporate employers' liability for punitive damages for their employees' torts. There is a continuing debate between supporters of the "complicity rule" (which imposes liability for punitive damages on the corporation when a superior officer ordered, participated in, or ratified the misconduct) and supporters of the "vicarious liability rule" (which imposes liability for punitive damages on the corporation for the misconduct of all employees acting within the general scope of their employment). *See* Ghiardi, *Personal Injury Damages in Wisconsin* secs. 2.15–2.16 (Wis. Current Law Series 1964); Ghiardi, *Punitive Damages in Wisconsin,* 60 Marq. L. Rev. 753, 771–774 (1977); Owen, *Punitive Damages in Products Liability Litigation,* 74 Mich. L. Rev. 1257, 1299–1308 (1976); 4 *Restatement of Torts* (Second) sec. 909 (1977).

damages to some plaintiffs by having this court eliminate all punitive damages and by having us allow the wrong-doer to go unpunished. The supposed unfairness Ford attributes to punitive damages ignores the effort and money required of the early plaintiffs to uncover and prove the misconduct. Later plaintiffs will often be able to use the information gathered by the first plaintiffs and benefit from the early favorable verdicts and settlements. The "windfall criterion" overlooks that the payment of punitive damages to the injured party is justifiable as a practical matter, because such damages do serve to compensate the injured party for uncompensated expenses, *e.g.*, attorneys' fees and litigation expenses, and that the windfall motivates reluctant plaintiffs to go forward with their claims. If punitive damages were to be paid to the public treasury, fewer wrongdoers would be punished because the injured would have no inducement to spend the extra time and expense to prove a claim for punitive damages once an action had been brought.[17] The basic question in determining whether punitive damages should be outlawed in product

---

[17] The Model Uniform Product Liability Act retains the concept that the award of punitive damages is made to the injured party and not to the state. "While the argument that 'since the damages are non-compensatory, they should go to the state' has some merit, the approach was rejected because of constitutional problems and the fact that it might place a claimant's attorney in a potential conflict of interest situation by forcing the attorney to represent both the claimant and the state. *See* 'Task Force Report' at VII–79." 44 Federal Register No. 212, p. 62749 (Oct. 31, 1979).

*See also* McCormick, *Damages* sec. 77 (1935) p. 278: "Finally, the seeming inconsistency of assessing the exemplary damages as a punishment and awarding the benefit of them to the plaintiff and not to the state may be justified by considerations already mentioned; namely, the advantage of furnishing an incentive for this sort of private prosecution of wrongs which the public prosecutor would ignore. . . ."

liability cases is not whether some injured party is going to make a profit but whether punitive damages will punish and deter, objectives which are in the public interest.[18]

Ford views its strongest argument as the one that most concerned Judge Friendly in *Roginsky,* namely that large claims for punitive damages in multiple product liability cases cannot be administered fairly to avoid ruinous results to the defendant for a single defect appearing in many products. Judge Friendly saw no way to impose an "effective ceiling on punitive awards in hundreds of suits in different courts [which] may re-

[18] Ford argues that, unlike in intentional torts, in products liability cases punitive damages are an inefficient deterrent because no clear standard is imposed. Ford's argument is fallacious for several reasons. The standard for the award of punitive damages is the same in both types of cases—"outrageous" conduct. Although words such as malicious, willful, wanton, and reckless disregard, leave room for interpretation, and although it may be difficult to predict whether the fact-finder will determine that particular conduct is in reckless disregard of the plaintiff's rights, there are many cases defining these words and they provide an adequate standard to govern conduct. The Wisconsin standard for the imposition of punitive damages is the standard generally accepted by courts and appears to be the standard used in various laws referred to herein which are currently being proposed. The proposed Model Uniform Product Liability Act requires that the claimant prove that the product seller's conduct demonstrated reckless disregard for the safety of others. The phrase "reckless disregard" is defined as "conscious indifference to the safety of persons or entities that might be harmed by the product." Sec. 102(J). The analysis of this section refers to Prosser's definition of reckless disregard and explains that the "term denotes aggravated conduct which represents a major departure from ordinary negligence." The comments to the Uniform Act state that it is therefore "clear that a product seller does *not* have to pay punitive damages under ordinary strict liability or negligence standards which fall short of reckless disregard." Model Uniform Product Liability Act, 44 Federal Register, No. 212, pp. 62717, 62720, 62749 (Oct. 31, 1979).

sult in an aggregate which, when piled on large compensatory damages, could reach catastrophic amounts."[19] *Roginsky, supra*, 378 F.2d 832, 839.

Professor Owen, studying the MER/29 litigation which concerned Judge Friendly in the *Roginsky* case and which now "has run its course," concludes that "the threat of bankrupting a manufacturer with punitive damages awards in mass disaster litigation appears to be more theoretical than real." 74 Mich. L. Rev. at 1324–25. Nevertheless, we cannot so easily dismiss the risk of catastrophic punitive damages, and we must recognize that the difficulty of measuring and controlling punitive damages awards which exists in any tort case is compounded in product liability cases which may involve inflammatory fact situations, wealthy corporate defendants and multiple lawsuits.

Ford hints of economic disaster if punitive damages are imposed. Ford intimates there is a "product liability crisis" referring to the *Interagency Task Force on Product Liability: Final Report* (Washington: Dept. of Commerce, 1977) and *Report of the California Citizens' Commission on Tort Reform, Righting the Liability Balance* (1977). Ford warns that the public will suffer if punitive damages are so high that businesses shut down. But various studies, some of which are relied upon by Ford, conclude that the data do not give credence to the manufacturer's dire predictions.

As to the "compensatory damage crisis," the Wisconsin Legislative Council Staff concluded that it is difficult to determine the extent of product liability claims and the scope and nature of the problems of imposing compensatory damages on the manufacturer:

---

[19] The principle that the same act may subject a defendant to liability for more than one punitive damages award was established in *Luther v. Shaw*, 157 Wis. 234, 147 N.W. 18 (1914).

"Beginning in June of 1976, a Federal Interagency Task Force began an intensive study of the subject. In November of 1977, it published a *Final Report*. The *Final Report* of the Task Force found that some extraordinary assertions about the product liability problem were not true, such as some insurers' claim that one million product liability claims were filed in 1976. The Task Force concluded that the best 'estimate' of the number of product liability claims filed in 1976 was between 60,000 and 70,000. The Task Force also found that some 'horror' cases related by manufacturers did not exist. On the other hand, the organized plaintiff's bar asserted that there was no product liability problem at all; the Task Force concluded this assertion also was unfounded. *Appendix A* presents some comparative data on product liability claims and awards drawn from two separate surveys.

"The Task Force encountered considerable difficulty in assessing the product liability problem, at least in part, because no single source, governmental or private, has kept statistically reliable data on the number and severity of product liability claims. . . ." Wisconsin Legislative Council Staff, *Product Liability: An Overview* 4 (Res. Bull. 78–83 1978).

As to the "punitive damage crisis," the *Department of Commerce—Model Uniform Product Liability Act,* which was developed based on the reports of the Interagency Task Force on Product Liability, similarly acknowledged that "[w]hile many product sellers have expressed great concern about the economic impact of punitive damages, the 'ISO Closed Claims Survey' suggests that the number of cases in which such damages are imposed is insubstantial. 'ISO Closed Claims Survey' at 183." 44 Federal Register No. 212, p. 62748 (Oct. 31, 1979). It appears that the existing facts and figures do not justify the manufacturers' concerns and fears about the economic impact of punitive damages. Nevertheless, the potential danger of multiple punitive and damages awards does exist.

Many of Ford's arguments point to possible problems in our tort system generally, apart from the issue of punitive damages. We need not and cannot in the instant case consider all the possible problems in the existing legal system relating to the entire field of product liability. We must decide only whether Ford is correct in asserting that this court, as a matter of public policy, should hold that in *all* product liability cases punitive damages are an unnecessary and undesirable vehicle for punishment and deterrence.

The very studies cited by Ford relating to product liability acknowledge that although the award of punitive damages presents practical problems, punitive damages "serve an important function in deterring product sellers from producing, distributing or selling dangerous products"[20] and "in deterring product sellers from reckless disregard for safety in the production, distribution or sale of dangerous products,"[21] and recommend the retention of punitive damages in product liability cases. *See Interagency Task Force on Product Liability, Product Liability: Final Report of the Legal Study*—Vol. I, pp. 60–61; Vol. V, pp. 116–134; *Dept. of Commerce —Task Force on Product Liability, Model Uniform Product Liability Act* sec. 120 (October 31, 1979); *Report of the California Citizens' Commission on Tort Reform, Righting the Liability Balance* (1977) p. 12.[22]

[20] Dept. of Commerce Analysis of Draft Uniform Product Liability Law, 44 Fed. Register, No. 9, p. 3002 (Jan. 12, 1979). For a discussion of the Uniform Law, *see* Twerski & Weinstein, *A Critique of the Uniform Product Liability Law—A Rush to Judgment*, 28 Drake L.Rev. 221 (1978–79).

[21] Model Uniform Product Liability Act, 44 Federal Register No. 212, p. 62748 (Oct. 31, 1979).

[22] The Missouri Court of Appeals in a case involving a Ford product concluded that there was no public policy reason for eliminating punitive damages from products liability cases: "[G]iven the purpose of punitive damages to punish a defendant for an aggravated act of misconduct and to deter similar conduct

Professors Murphy, Grad & Santagata, *Analyzing Product Liability, An Interim Report to The National Chamber Foundation* 60 (Columbia University Legislative Drafting Research Fund, Sept. 30, 1978) similarly concluded: "[P]unitive damages may be a strong incentive to more care in manufacture; not only will the manufacturer be encouraged to produce goods non-negligently, but punitive damages could be a strong incentive to affirmative product safety programs. Moreover, allowing punitive damages encourages settlements and is a means of paying attorneys' fees as a contingency while still awarding full pecuniary damages to the plaintiff."

We are persuaded that the problems Ford raises as to punitive damages, especially the problem of con-

---

in the future by the defendant and others, there is no fundamental reason for excluding products liability cases from the cases in which punitive damages may be recovered." *Rinker v. Ford Motor Co.*, 567 S.W.2d 655, 668 (Mo. Ct. App. 1978).

The Alaska Supreme Court concluded "that as a matter of public policy, punitive damages can serve several useful functions in the products liability area. . . . We therefore decline to jettison the doctrine of punitive damages in this area of the law." *Sturm, Ruger & Co., Inc. v. Day*, 594 P.2d 38, 47 (Alaska 1979).

The Proposed Uniform State Product Liability Act, National Product Liability Council (undated), sec. 206, p. 1–10, retains punitive damages for "the deterrent impact." p. 11–9. The National Product Liability Council is composed largely of manufacturers. Sec. 206 provides:

"In any action for personal injury, death or property, economic or other damage, exemplary or punitive damages may be awarded only if the plaintiff proves beyond a reasonable doubt that the defendant acted or failed to act with actual malice or with intentional and reckless disregard for the safety of others. Punitive damages shall not be awarded in an amount greater than treble the compensatory damages awarded excluding any damages for pain and suffering or other intangible losses."

The Council of State Governments, 1978 Suggested State Legislation, Vol. 37 (1977), Product Liability Tort Reform Act, at 103–108, abolishes all punitive damages in product liability actions.

trolling multiple awards, can be minimized in this state in the litigation process. We are persuaded that punitive damages may play a vital role in product liability cases and that the role must be shaped, as is the role of all damages awards, to fit the context in which the particular case arises. Judicial controls exist in this state for determining whether the imposition of punitive damages is appropriate in the particular case and for determining the amount of the punitive damages award which will serve the punishment and deterrent objectives of punitive damages, without inflicting a penalty on a defendant disproportionate to the defendant's wrong and contrary to the public interest. We believe the judicial controls, which we describe below, will provide for fair administration of punitive damage awards in this state.

### 4.

In Wisconsin the trial judge initially determines whether the evidence establishes a proper case for the allowance of punitive damages and for the submission of the issue to the jury. *Meshane v. Second Street Co.*, 197 Wis. 382, 386–387, 222 N.W. 320 (1928). Unless there is evidence from which a jury could find that the wrongdoer's conduct was "outrageous," the trial court should not submit the issue of punitive damages to the jury. *Mid-Continent Refrigerator Co. v. Straka*, 47 Wis.2d 739, 748, 178 N.W.2d 28 (1970); Ghiardi, *Personal Injury Damages* sec. 2.07 (Wis. Cont. Leg. Ed. J. 1964).

If the issue of punitive damages is submitted to the jury, the question arises as to the degree of certitude the trier of facts must have to find that the defendant acted maliciously or in a willful or reckless disregard of the plaintiff's rights, justifying the imposition of

punitive damages. It appears that the ordinary burden of proof, that is, to a reasonable certainty by the greater weight of the credible evidence (Wis. J.I.— Civil No. 200), has been applied, without discussion, in punitive damages cases to the issue of whether the defendant acted maliciously or in willful or reckless disregard of the plaintiff's rights. *See, e.g., Manz v. Klippel,* 158 Wis. 557, 562–563, 149 N.W. 375 (1914); *Topolewski v. Plankinton Packing Co.,* 143 Wis. 52, 70, 126 N.W. 554 (1910); *Thomas v. Williams,* 139 Wis. 467, 469, 121 N.W. 148 (1909). *See also,* Wis. J.I.— Civil No. 1707, Punitive Damages; Malice; No. 2518, Defamation, Express Malice; No. 2520, Defamation, Punitive Damages; and No. 2600, Malicious Prosecution: Malice.

This court has required a higher burden of proof, *i.e.,* to a reasonable certainty by evidence that is clear, satisfactory and convincing (Wis. J.I.—Civil Nos. 205 and 210), "[i]n the class of cases involving fraud, of which undue influence is a specie, gross negligence, and civil actions involving criminal acts." *Kuehn v. Kuehn,* 11 Wis.2d 15, 26, 104 N.W.2d 138 (1960). *See, e.g., Klipstein v. Raschein,* 117 Wis. 248, 253, 94 N.W. 63 (1903) (whether fraud occurred); *Lang v. Oudenhoven,* 213 Wis. 666, 668, 252 N.W. 167 (1934) (whether moral turpitude existed in cases of fraud); *Martell v. Klingman,* 11 Wis.2d 296, 310–311, 105 N.W.2d 446 (1960) (whether gross negligence existed); Comment to Wis. J.I.—Civil No. 2401, Misrepresentation: Intentional Deceit (whether intentional deceit occurred); and *Poertner v. Poertner,* 66 Wis. 644, 647, 29 N.W. 386 (1886) (factual issue of adultery in divorce action). This burden of proof, referred to as the middle burden of proof, requires a greater degree of certitude than that required in ordinary civil cases but a lesser degree than that required to convict in a criminal case.

The middle standard for burden of proof was established by this court as applicable to more serious allegations than factual issues in the usual civil case. *Poertner v. Poertner, supra,* 66 Wis. at 647. This court has stated that "a greater degree of certitude is required before there is a finding against a defendant who will be subjected to the stigma attached to the commission of certain classes of acts." *Layton School of Art & Design v. WERC,* 82 Wis.2d 324, 362–363, 262 N.W.2d 218 (1978).

The issue of whether the defendant acted maliciously or in willful or reckless disregard of the plaintiff's rights, justifying recovery of punitive damages, falls within the "certain classes of acts" for which stigma attaches and is a more serious allegation than the ordinary factual issue in a personal injury action. Therefore, for all punitive damage claims we adopt the middle standard for the burden of proof for the issue of whether the defendant's conduct was "outrageous"[23]; we do not limit this rule to product liability cases. We hold that the middle burden of proof shall apply to punitive damage claims hereafter, whether or not the cause of action has heretofore arisen, except that it shall not apply where a trial was begun before September 1, 1980, or a

[23] *See* Model Uniform Product Liability Act, sec. 120, which adopts this middle burden of proof.

"Sec. 120. Punitive Damages

"(A) Punitive damages may be awarded to the claimant if the claimant proves by clear and convincing evidence that the harm suffered was the result of the product seller's reckless disregard for the safety of product users, consumers, or others who might be harmed by the product." 44 Federal Register No. 212, p. 62748 (Oct. 31, 1979).

The Proposed Uniform State Product Liability Act (National Product Liability Council undated) sec. 206, suggests a "beyond reasonable doubt" standard. *See* note 22, *supra.*

verdict or judgment based upon the ordinary burden of proof has been entered before September 1, 1980, and where there is no reason to require a new trial other than for the application of the middle burden of proof.[24]

Even if the jury is satisfied to a reasonable certainty by evidence that is clear, satisfactory and convincing that the defendant's conduct was "outrageous," in Wisconsin, the jury need not award punitive damages. Plaintiff is not entitled to punitive damages as a matter of right. The assessment of punitive damages "lies entirely in the discretion of the jury, not in any right of the one wronged. Even though the evidence may sustain exemplary damages, still if the jury does not award

[24] A similar application of new rules was set forth in *Bielski v. Schulze, supra,* 16 Wis.2d at 19.

The court's reasons for limiting what would usually be a retrospective application of new law were explained by this court in *Fitzgerald v. Meissner & Hicks, Inc.,* 38 Wis.2d 571, 577, 157 N.W.2d 595 (1968) as follows:

"The possibility of imposing an excessive burden on the administration of justice was a compelling judicial reason for the limitation placed on the retrospective application of this court's decision in *Bielski v. Schulze* (1962), 16 Wis.2d 1, 114 N.W.2d 105, which changed our contribution rule and discarded the concept of gross negligence. This is best described by former Mr. Justice THOMAS E. FAIRCHILD in his article in 46 Marquette L. Rev. 1, 15:

" 'In *Bielski* the court limited the retrospective application of the change in law with respect to contribution and gross negligence. Here again were elements of law which are ordinarily not relied upon by people who are about to engage in tortious conduct. Yet the court was mindful of the fact that if full retrospective application were given, burdens of further litigation would probably be imposed on litigants and the public in cases where claims had been substantially disposed of by litigation or settlement. Such burdens would seem to be wasteful.' "

For these same reasons we are limiting the retroactive effect of the new burden of proof applicable to the issue of whether the defendant's conduct was "outrageous".

them, it is not error." *Malco v. Midwest Aluminum Sales,* 14 Wis.2d 57, 63, 109 N.W.2d 516 (1961). The jury's refusal to award punitive damages is not reviewable. The amount awarded can never be unreasonably low. *See* Ghiardi, *Punitive Damages in Wisconsin,* 60 Marq. L. Rev. 753, 765.

The jury determines the amount of the punitive damages with the view to having the punitive damages accomplish their purposes, namely, punishment and deterrence.[25] Our cases have stated that the factors to be considered by the jury in determining the proper amount to be awarded as punitive damages include the grievousness of defendant's acts; the degree of malicious intention; the potential damage which might have been done by such acts as well as the actual damage; and the defendant's ability to pay. *Herrmeyer v. Kleeman,* 76 Wis.2d 410, 414, 415, 251 N.W.2d 445 (1977); *Malco v. Midwest Aluminum Sales Co., supra,* 14 Wis.2d at 66; *Dalton v. Meister,* 52 Wis.2d 173, 180, 188 N.W.2d 494 (1971); 4 Restatement of Torts (Second) sec. 908, Comment *e,* pp. 466–467 (1977).

Punitive damages must be decided on a case-by-case basis. The circumstances of each case must be considered to determine whether the award under the particular cir-

---

[25] Sec. 120[B] of the Model Uniform Product Liability Act provides that the jury determines whether punitive damages should be awarded and the judge determines the amount of the punitive damage award. The Report of the California Citizens' Commission on Tort Reform, *Righting the Liability Balance* pp. 151–153 (1977), recommends constitutional and statutory changes so that the juries decide the appropriateness of punitive damages and the trial judge the amount, subject to judicial review.

*Restatement of Torts* (Second) sec. 908, comment *d* at 466, relies upon judicial control to avoid excess punitive awards:

"The excessiveness of punitive damages in a case in which they are allowable may be ground for reversal, for a new trial, or for a remittitur under the usual rules by which the court controls the jury's award of compensatory damages."

cumstances of that case serves the purposes of punitive damages. *Fahrenberg v. Tengel,* 96 Wis.2d 211, 233–236, 291 N.W.2d 516 (1980). An award which is more than necessary to serve its purposes (punishment and deterrence) or which inflicts a penalty or burden on the defendant which is disproportionate to the wrongdoing is excessive and is contrary to public policy. *Id.,* 96 Wis.2d at 234.[26]

---

[26] One way of controlling the totality of punitive damages is to limit each award in some way, such as a multiple of compensatory damages as antitrust acts. This court has recognized that the amount of compensatory damages or criminal fines is relevant but has refused to impose any mathematical formula for calculating punitive damages. *Malco v. Midwest Aluminum Co.,* 14 Wis.2d 57, 66, 109 N.W.2d 516 (1961); *Dalton v. Meister,* 52 Wis.2d 173, 181, 188 N.W.2d 494 (1971). The Uniform Act rejected limiting punitive damages to a multiple of compensatory damages, commenting:

"[T]his approach . . . is not appropriate in the case of product liability because this area of the law addresses a multiplicity of different kinds of wrongful acts. Antitrust Law, on the other hand, addresses one basic kind of wrongful act: an antitrust violation. Under this Section, the defendant's wrongful conduct could range from that which merely could cause damage to property to conduct which could result in the deaths of many people. Antitrust law violations involve economic injury only, and rarely, if ever, result in serious physical injury or death. Thus, the punitive damages in product liability actions do not lend themselves to quantification in the same manner as do such damages in antitrust cases." 44 Federal Register No. 44, p. 62749 (Oct. 31, 1979).

But see sec. 206, Proposed Uniform State Product Liability Act, National Product Liability Council (undated), quoted at n. 22, *supra,* which limits punitive damages to "treble the compensatory damages awarded excluding any damages for pain and suffering or other intangible losses." The analysis of this section states:

"A formula tied to actual damages rather than specified amounts is used in the administration of the antitrust laws. It is appropriate in product liability actions because, in the aggregate, punitive awards tend to be so large that the viability of the business

The danger of excessive multiple punitive damages awards can be avoided in Wisconsin because the jury may consider the wealth of the defendant which would include consideration of compensatory and punitive damages and fines and forfeitures already imposed on the defendant or likely to be imposed on the defendant.[27]

Professor Owen in his article, *Punitive Damages in Products Liability Litigation,* 74 Mich. L. Rev. 1257, 1319 (1976), stated:

"[T]he punitive damages assessment should reflect other 'punishment' already imposed, or likely to be imposed, upon the manufacturer as a result of its marketing misconduct. This other punishment includes compensatory damages awards to the plaintiff and other injured consumers, punitive damages awarded to other plaintiffs, and any criminal penalties." (Footnotes omitted.)

A similar conclusion is reached in the discussion of punitive damages in 4 *Restatement of Torts* (Second) (1977) without referring expressly to product liability:

"Another factor that may affect the amount of punitive damages is the existence of multiple claims by

and the possibility of future recoveries may be threatened. During discovery, a punitive damage claim can be used to justify exploration of a corporation's books and records and evidence used at trial to determine what a 'punitive' award would be may enhance the 'deep pocket' image of the defendant seller. The maximum limit also alleviates the burden on sellers of products who are subject to multiple awards of punitive damages since each defective product may give rise to a separate punishable tort.

"Section 206 reduces the possibility that an award of punitive damages to one victim will preclude the award of compensatory damages to a subsequent victim. . . ." p. 11–10.

[27] *See Fahrenberg v. Tengel,* 96 Wis.2d 211, 225–226, 291 N.W. 2d 516 (1980).

For a collection of cases relating to evidence admissible on defendant's behalf as to lack of financial resources, *see* Annot., *Admissibility on Defendant's Behalf, as Matter in Mitigation of Punitive Damages, of Evidence as to His Lack of Financial Resources,* 79 A.L.R.3d 1138 (1977).

numerous persons affected by the wrongdoer's conduct. It seems appropriate to take into consideration both the punitive damages that have been awarded in prior suits and those that may be granted in the future, with greater weight being given to the prior awards. In a class action involving all claims, full assessment of the punitive damages can be made." Sec. 908, comment *e* at 467.

Professor Owen correctly points out that the jury can more reasonably measure punitive damage awards if the jury gives careful consideration to factors which are significant to determining the deterrent and punitive objectives of punitive damages. He suggests the jury consider the following factors which we view as amplifications of the factors which this court has described in prior cases: the seriousness of the hazard to the public; the profitability of the misconduct; the attitude and conduct on discovery of the misconduct; the degree of the manufacturer's awareness of the hazard and of its excessiveness; the employees involved in causing or concealing the misconduct; the duration of both the improper behavior and its concealment; the financial condition of the manufacturer and the probable effect thereon of a particular judgment; and the total punishment the manufacturer will probably receive from other sources.[28]

[28] *Punitive Damages in Products Liability Litigation,* 74 Mich. L. Rev. 1257 (1976). Professor Owen also suggests that the jury consider plaintiff's litigation expenses and that the jury consider punitive damages as a multiple of the profitability of the misconduct. These factors have not been considered in our prior cases, and we express no view on these matters in the instant case.

Sec. 120[B] of the Model Uniform Product Liability Act, 44 Federal Register No. 212, pp. 62748, 62749 (Oct. 31, 1979), sets forth guidelines for the court in determining the amount of the punitive damages to be awarded. The draftsmen explain that the guidelines were derived from sec. 549.20(3), Minn. Stats. Ann. (Supp. 1978) which in turn relied on Professor Owen's article. However, sec. 120[B] does differ from Professor Owen's list

It is encumbent on the parties in the product liability action to produce evidence which enables the jury to reach a proper punitive damages verdict. If they do not, they will be in a poor position to complain about the verdict.

An additional control over punitive damage awards is that the determination of the award in Wisconsin is not left solely to the jury. In Wisconsin the judge has control over excessive punitive damage awards. In *Malco v. Midwest Aluminum Sales*, 14 Wis.2d 57, 65, 109 N.W. 2d 516 (1961) this court said:

". . . It seems to us that once the jury has decided in its discretion to award punitive damages, the amount thereof must be subject to the control of the court. True, the jury need not award any punitive damages, but having done so, the amount thereof should be subject to the court's revision in the same manner as com-

especially in regard to subsection (8). Sec. 120[B] provides as follows:

"(B) If the trier of fact determines that punitive damages should be awarded, the court shall determine the amount of those damages. In making this determination, the court shall consider:

"(1) The likelihood at the relevant time that serious harm would arise from the product seller's misconduct;

"(2) The degree of the product seller's awareness of that likelihood;

"(3) The profitability of the misconduct to the product seller;

"(4) The duration of the misconduct and any concealment of it by the product seller;

"(5) The attitude and conduct of the product seller upon discovery of the misconduct and whether the conduct has been terminated;

"(6) The financial condition of the product seller;

"(7) The total effect of other punishment imposed or likely to be imposed upon the product seller as a result of the misconduct, including punitive damage awards to persons similarly situated to the claimant and the severity of criminal penalties to which the product seller has been or may be subjected; and

"(8) Whether the harm suffered by the claimant was also the result of the claimant's own reckless disregard for personal safety."

pensatory damages. . . . We hold that the *Powers* rule extends to punitive damages and a trial court has the power to reduce the amount of punitive damages to what it determines is a fair and reasonable amount for such kind of damages."

The *Powers* rule, *Powers v. Allstate Ins. Co.*, 10 Wis.2d 78, 102 N.W.2d 393 (1960), allows both the trial court and the appellate court to determine a reasonable award and to grant the plaintiff the option of accepting that sum or having a new trial. This court has exercised this kind of control in punitive damages cases. *Jones v. Fisher*, 42 Wis.2d 209, 220–222, 166 N.W.2d 175 (1969); *Roach v. Keane*, 73 Wis.2d 524, 541, 542, 243 N.W.2d 508 (1976).

The Alaska Supreme Court found the argument for greater judicial scrutiny and tighter judicial control of punitive damages cogent and concluded that "[t]he spectre of bankruptcy and excessive punishment can be in part dispelled to the extent that trial and appellate courts exercise their powers of review." *Sturm, Ruger & Co., Inc. v. Day*, 594 P.2d 38, 48 (Alaska 1979).

Judge Friendly expressed skepticism in *Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832, 840 (2d Cir. 1967), regarding effective judicial control over multiple punitive awards because "a state otherwise willing to impose such self-denying limits might be disinclined to do so until assured that others would follow suit." We do not believe such skepticism of state courts is necessarily deserved, and we are confident that the fair administration of punitive damage awards in the state courts of this country will prove Judge Friendly's fears unfounded. Furthermore the very arguments which Ford and Judge Friendly make against judicial imposition of punitive damages are the ones repeatedly made against individual state legislative tort reform.[29] These argu-

[29] *See* Maine Governor's Task Force 1978; Georgia Report of the Senate Products Liability Study Committee 1978; Connecticut Governor Grasso's veto message of product liability tort bill

ments presuppose the need for national legislation or the adoption of a uniform law by all or a majority of states. In view of the undeniably favorable effects of imposing punitive damages, we do not believe this court should abandon the concept of punitive damages in all product liability suits and ask the citizens of this state to wait for a national law or legislative reform in all 50 states.

Although the risk that manufacturers may be subjected to excessive punitive damages is real, the need for punitive damages as a tool for punishment and deterrence is also real. We are persuaded that we should not rule out the possibility of awarding punitive damages in all product liability cases as Ford urges. We believe punitive damages subject to judicial control can be a valuable and effective tool in deterring and punishing misconduct.

## D.

Having decided that punitive damages are recoverable in a product liability case where there is a showing of malice, vindictiveness, ill-will, or wanton, willful or reckless disregard of plaintiff's rights, we now turn to the plaintiff's complaint to determine if it pleads facts sufficient to support a claim for punitive damages.

The plaintiffs' pleading as to their claim for punitive damages are to be construed, as all pleadings are, to do substantial justice to the parties. Sec. 802.02 (6), Stats. The claim should be dismissed as legally insufficient only if it is clear that the plaintiff cannot recover under any condition. *Ollerman v. O'Rourke Co., Inc.*, 94 Wis.2d 17, 24, 288 N.W.2d 95 (1980).

(1978); California Governor Brown's veto of product liability tort bill (1979); cited in Model Uniform Product Liability Act, Analysis of sec. 101, 44 Federal Reporter, No. 212, p. 62716–62717 (Oct. 31, 1979).

On the basis of the facts pleaded and reasonable in-ferences therefrom the complaint alleges that Ford knew of the defects in the design of the gas tank and filler neck and in the lack of barrier between the gas tank and passenger compartment in the 1967 Mustang and of the fire hazard associated with the design because of tests run by Ford as early as 1964; that for years before this accident Ford knew that these defects were causing serious burn injuries to occupants of these and similar cars; that years before the accident involved in the instant case Ford knew how to correct these defects in ways that would have prevented the plaintiffs' burns, but Ford intentionally concealed this knowledge from the government and the public; that despite this knowl-edge Ford deliberately chose not to recall its 1967 Mus-tangs and not to disclose the defects to the public by the issuance of warnings because Ford wanted to avoid paying the costs of recall and repair and wanted to avoid the accompanying bad publicity; and that Ford's conduct was intentional, reckless, willful, wanton, gross and fraudulent. These facts, if proved by the plaintiff, por-tray conduct which is willful and wanton and in reckless disregard of the plaintiff's rights. We conclude that the complaint alleges facts sufficient to state a claim for punitive damages in a product liability action predicated on negligence or strict liability.[30]

[30] Prosser points out that products liability is generally a matter of negligence or strict liability. In rare instances, a products lia-bility suit may rest upon intent, and usually such cases are dealt with in an action for deceit. Prosser, *Law of Torts* 641 (4th ed. 1971). The briefs of the plaintiffs in this case indicated that if this court saw fit to prohibit punitive damages in products liability cases based on strict liability or negligence, the complaint for punitive damages could be read as a cause of action for fraud or misrepresentation. In view of our holding we need not deter-mine if the allegations state such a cause of action.

## III.

We now turn to punitive damages in survival actions, wrongful death actions, and in actions by parents for damages arising from injury to a minor child.

### A.

The administrator of the estates of Christopher DuVall and Kip Wangen seeks compensatory damages for the pain and suffering of each child and punitive damages. Sec. 895.01, Stats., governs which actions survive:

"895.01 **What actions survive; actions not to abate.** (1) In addition to the causes of action which survive at common law the following shall also survive: Causes of action for the recovery of personal property or the unlawful withholding or conversion of personal property, for the recovery of the possession of real estate and for the unlawful withholding of the possession of real estate, for assault and battery, false imprisonment, invasion of privacy, violation of s. 968.31(2)(d) or other damage to the person, for all damage done to the property rights or interests of another, for goods taken and carried away, for damages done to real or personal estate, equitable actions to set aside conveyances of real estate, to compel a reconveyance of real estate, or to quiet the title to real estate, and for a specific performance of contracts relating to real estate. Causes of action for wrongful death shall survive the death of the wrongdoer whether or not the death of the wrongdoer occurred before or after the death of the injured person."

Thus under sec. 895.01(1), Stats., causes of action for the recovery of "damage to the person," that is, personal injury actions, survive. There is no limitation in the statute as to the nature of the damages. Damages to which a decedent would have been entitled for pain and suffering survive his death and pass to the estate of

the decedent. *Koehler v. Waukesha Milk Co.*, 190 Wis. 52, 55, 56, 208 N.W. 901 (1926). As we have previously stated, a claim for punitive damages is a theory of relief arising out of the same transaction or occurrence giving rise to the claim for personal injury. Had the child survived, the child in the case at bar could claim compensatory and punitive damages. Because each child's claim for personal injury survived and passed to the child's estate, we conclude the child's claim for punitive damages passed to the estate. Punitive damages incident to damages for pain and suffering may therefore be awarded to the estate.

This holding is consistent with sec. 895.02, Stats.,[31] which prohibits recovery of punitive damages from a deceased wrongdoer's executor or administrator. Punitive damages serve no purpose after the wrongdoer's death. The implication of sec. 895.02, Stats., is that had the wrongdoer lived, punitive damages would be recoverable in any action which survived under sec. 895.01, Stats. The deterrent and punishment purposes of punitive damages are met if punitive damages are allowed against the wrongdoer who survives even if the victim is dead.

## B.

The complaints of the administrator of the estates of the deceased children allege wrongful death actions, namely that the parents of each child suffered the loss

[31] Sec. 895.02, Stats., provides:

"895.02 **Measure of damages against executor.** When any action mentioned in s. 895.01(1) shall be prosecuted to judgment against the executor or administrator the plaintiff shall be entitled to recover only for the value of the goods taken including any unjust enrichment of the defendant, or for the damages actually sustained, without any vindictive or exemplary damages or damages for alleged outrage to the feelings of the injured party."

of the services, society, companionship and pecuniary support of their child, for which compensatory and punitive damages are sought on behalf of the parents.

The cause of action for the child's pain and suffering which, as we discussed earlier, passes to a decedent's estate, is separate and distinct from this wrongful death action. The estate's action is for the wrong to the injured person; the wrongful death action belongs to named beneficiaries for their pecuniary loss; the latter action begins where the former ends. "It is not a double recovery, but a recovery for a double wrong." *Koehler v. Waukesha Milk Co.,* 190 Wis. 52, 56, 208 N.W. 901 (1926). *See also, Prunty v. Schwantes,* 40 Wis.2d 418, 162 N.W.2d 34 (1968).

This court has pointed out that a cause of action for wrongful death did not exist at common law; it is a purely statutory remedy and is derived from secs. 895.03 and 895.04, Stats. The question is whether punitive damages are recoverable under the wrongful death stattute.

Sec. 895.03, Stats., provides:

"Whenever the death of a person shall be caused by a wrongful act, neglect or default and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then and in every such case the person who would have been liable, if death had not ensued, shall be liable to an action for damages notwithstanding the death of the person injured; provided, that such action shall be brought for a death caused in this state."

Sec. 895.04 (4) and (5), Stats., provide:

"(4) Judgment for *damages for pecuniary injury* from wrongful death may be awarded to any person entitled to bring a wrongful death action. Additional *damages not to exceed $10,000 for loss of society and companionship,* may be awarded to the spouse or un-

emancipated or dependent children, or parents of the deceased.

"(5) If the personal representative brings the action, the personal representative may also *recover the reasonable cost of medical expenses, funeral expenses, including the reasonable cost of a cemetery lot, grave marker and perpetual care of the lot.* If a relative brings the action, the relative may recover such *medical expenses, funeral expenses, including the cost of a cemetery lot, grave marker and perpetual care of the lot,* on behalf of himself or herself or of any person who has paid or assumed liability for such expenses." (Emphasis supplied.)

The damages recoverable for wrongful death are thus specified by statute, namely: for pecuniary injury, for loss of society and companionship and for medical and funeral expenses.

Pecuniary injury is not defined in the statute. This court first referred to the statutory language "pecuniary injury" in *Potter, Adm'r etc., v. The C. & N.W. R.R. Co.,* 21 Wis. 377 (*372) (1867), construing the predecessor to the present sec. 895.04(4), Stats., which allowed recovery of "damages, not exceeding five thousand dollars, as they [the jury] shall deem fair and just in reference of the pecuniary injury resulting from such death to the relatives of the deceased . . . ." The parents in *Potter* sought to recover damages for the death of their minor child, and the court set forth what it viewed as the generally accepted principles by which damages in a wrongful death action should be assessed, explaining:

". . . The statute does not say, in terms, on what principle the damages are to be assessed. But all the authorities are to the effect, that vindictive damages are not to be given; nor are they to be given for loss of society, or as a *solatium,* or for injury to feelings; but they must be founded on pecuniary loss actual or expected, . . . ." *Potter, supra,* 21 Wis. at 379 (*374).

Although the legislature has on several occasions amended the wrongful death statute by adding elements

for which damages may be awarded, such as loss of society and companionship and medical and funeral expenses, and by eliminating the limitation of the amount of damages for pecuniary injury, the statute does not refer to punitive damages and continues to refer only to "pecuniary injury." The above quotation from *Potter* was repeated with approval in *Prunty v. Schwantes*, 40 Wis.2d 418, 426, 162 N.W.2d 34 (1968), in the court's discussion of the meaning of "pecuniary injury" under the present sec. 895.04(4), Stats. The rule stated in *Potter* is in accord with cases in other jurisdictions holding that punitive damages are not recoverable under wrongful death statutes which do not expressly or by clear implication confer a right to such damages. *See* cases cited in Annot., *Exemplary or punitive damages as recoverable in action for death*, 94 A.L.R. 384 (1935).

It may seem anomalous that punitive damages would be awarded to the victim who is maimed but not to the estate of the victim who is killed. This result can be explained, however, by an examination of the historical development of the wrongful death act. Although the act was designed to ameliorate the hardships caused by the English common law doctrine that the tortfeasor escaped liability if the victim died before judgment, the legislature has traditionally limited the elements of damages for which recovery could be had and has limited the amount of the recovery, because the legislature has feared that passion would run high where the wrongdoer causes death and that huge damage awards would be imposed on the wrongdoer. Prior to 1971, the Wisconsin legislature had limited the amount of damages recoverable for pecuniary injury in a wrongful death action to $35,000, and the statute still limits the amount recoverable for loss of society and companionship (now $10,000). Wisconsin Legislative Council, Judiciary Committee Advisory Committee on Auto Accident Liability,

*The Development of Wisconsin's Wrongful Death Statute, 1900 to Present* (Staff brief 71–13). In light of the legislative history of limiting damages in wrongful death cases, we conclude that the legislature did not intend that the factfinder have the ability to impose punitive damages on the wrongdoer in a wrongful death action. *See Robert v. Ford Motor Co.*, N.Y. S. Ct., App. Div. 3d Jud. Dist., Jan. 31, 1980, CCH Products Liability Reports, No. 437, par. 8619. We therefore conclude that punitive damages are not recoverable incident to damages for wrongful death under sec. 895.04, Stats.

## C.

The parents of Terri Wangen seek compensatory damages for their medical expenses for their minor daughter and loss of their daughter's services, society, companionship and pecuniary support and seek punitive damages incident to this claim.[32] The parents' claim is brought in addition to Terri Wangen's own claim for compensatory damages for pain, suffering, disability and reduced earning capacity and incident to which she also seeks punitive damages.

The court of appeals concluded that punitive damages are recoverable incident to the parents' cause of action for loss of society, companionship and pecuniary support, reasoning that this action is separate and distinct from the child's claim. The court of appeals further concluded that punitive damages are not recoverable incident to the parents' cause of action for medical ex-

---

[32] For a discussion of the cases which have considered the issue of punitive damages awarded to the parent, *see* Annot. *Spouse's or Parent's Right to Recover Punitive Damages in Connection with Recovery of Damages for Medical Expenses or Loss of Services or Consortium Arising From Personal Injury to Other Spouse or to Child*, 25 A.L.R.3d 1416 (1969).

penses or for the minor's lost earning capacity during minority, reasoning that this action is not separate and distinct from the child's claim. The court of appeals based its decision on an analysis of our prior cases relating to the parents' claims for damages on the injury of a minor child[33] and those relating to spouses' claims for damages on the injury of a spouse.[34] Our prior cases do recognize that the claims of the parent and those of the spouse are analogous.

The concept of what is a "separate claim" and what is a "derivative claim" has caused this court great difficulty, and "the cases are confusing." *White v. Lunder,* 66 Wis.2d 563, 574, 225 N.W.2d 442 (1975). In our more recent cases, the court has determined the rights of the spouses not by using the "separate claims concept" but by examining the context in which the question of the spouse's rights arise. *White v. Lunder, supra; Peeples v. Sargent,* 77 Wis.2d 612, 643, 253 N.W.2d 459 (1977). This approach should be used in the instant case to determine the rights of the parents.

We do not think that the concepts of or labels of "separate" or "derivative" are helpful in deciding for which claims the parents may recover punitive damages. There does not appear to be any sound basis for treating the parents' claim for medical expenses and loss of minor's earning capacity during minority differently from the parents' claims for loss in the society, companionship and pecuniary support in the context of awarding punitive damages. Early cases of this court established the right of a parent on the seduction of a minor child to recover damages for medical expenses and lost services as well

---

[33] *See, e.g., Callies v. Reliance Laundry Co.,* 188 Wis. 376, 379–81, 206 N.W. 198 (1925); *Shockley v. Prier,* 66 Wis.2d 394, 404, 225 N.W.2d 495 (1975).

[34] *See, e.g., Moran v. Quality Aluminum Casting Co.,* 34 Wis.2d 542, 150 N.W.2d 137 (1967); *Schwartz v. Milwaukee,* 54 Wis.2d 286, 293, 195 N.W.2d 480 (1972); *White v. Lunder,* 66 Wis.2d 563, 574, 225 N.W.2d 442 (1975); *Peeples v. Sargent,* 77 Wis.2d 612, 643, 253 N.W.2d 459 (1977).

as punitive damages. *Luther v. Shaw,* 157 Wis. 231, 233, 147 N.W. 17 (1914), 157 Wis. 234, 239, 147 N.W. 18 (1914); *Lavery v. Crooke,* 52 Wis. 612, 9 N.W. 599 (1881). Both the parents' claim for loss of earning capacity and medical expenses and the parents' claim for loss of society and companionship are "personal injury rights of action." *Peeples v. Sargent,* 77 Wis.2d at 643, 253 N.W.2d 459. The objectives of punitive damages are served by allowing recovery of such damages in connection with both types of claims. We conclude punitive damages are recoverable incident to both types of claims.

Punitive damages awarded incident to the awards of compensatory damages to the parents and to the child would not constitute "double recovery" as Ford states, but would be awarded to punish and deter the tortfeasor for the willful and wanton invasion of the independent rights of each injured person. *Cf. Sheats v. Bowen,* 318 F. Supp. 640, 647–648 (D. Del. 1970), and *Kohl v. Graham,* 202 F. Supp. 895, 897 (D. Colo. 1962). In *Luther v. Shaw, supra,* 157 Wis. at 233, 147 N.W. 17, the child recovered punitive damages for breach of promise to marry, and the parents recovered punitive damages for seduction.

We hold that punitive damages are recoverable by the parents of an injured child incident to their action for compensatory damages.

### D.

Ford argues that even if this court agrees to allow punitive damages in product liability cases, this court should hold that there can be only one punitive damage award in a given case regardless of the number of injured plaintiffs and that no punitive damages may be awarded if the defendant has previously paid punitive damages in a case arising out of the same alleged wrongful act.

Ford cites *John Mohr & Sons, Inc. v. Jahnke,* 55 Wis. 2d 402, 198 N.W.2d 363 (1972) to support its argument that multiple punitive damage awards per se violate due process. *John Mohr* involved the imposition of both statutory treble damages and punitive damages for the same wrong and is inapposite. Ford's liability in this case is premised on the manufacture of one car, but this act may constitute multiple wrongs, and the wrongdoer can be punished for each wrong he inflicted.

In *Luther v. Shaw,* 157 Wis. 234, 239–240, 147 N.W. 18 (1914), this court permitted the parent to recover punitive damages for the seduction of a child and the child to recover punitive damages for breach of promise to marry, saying:

"We do not think the fact, that for the same wrongful act whereby plaintiff's daughter also suffered the defendant had against him a verdict of $500 exemplary or punitory damages, can be considered in bar or in mitigation of exemplary or punitory damages in this case. . . .

"We have found no precedent holding that for the same act which constituted a wrong against two different persons the defendant may or that he may not be subject to exemplary damages at the suit of each, although cases like *Klopfer v. Bromme, supra* [26 Wis. 372], and *Brown v. Swineford, supra* [44 Wis. 282], furnish some analogy to show that he may be so liable. If the point has ever been directly adjudicated we have been unable to find such adjudication. But there is a decided implication in the language of the adjudged cases and in the text of Sutherland on Damages to the effect that this may be done. Sutherland, Dam. (3d ed.) secs. 987, 1281, 1283, and 1216. In the case of a libel of several different persons by a single publication they must bring several actions, and it seems quite proper, where express malice is shown, that each should recover exemplary damages. . . ."

In *State v. Rabe,* 96 Wis.2d 48, 291 N.W.2d 809 (1980), we held that the intoxicated driver who negligently op-

erates a motor vehicle and causes several deaths can be punished for each death as a separate offense.

The gravamen of Ford's alleged offense is not only the manufacture and distribution of the car but the injury caused thereby. We are not persuaded that the federal and state constitutions require us to limit punitive damages arising from a single product and a single incident to a single award for punitive damages, and we do not adopt such a rule. We believe that a wrongdoer is protected against oppressive multiple punitive damage awards by the judicial controls we have set forth herein.

For the reasons set forth, we hold that the complaints state a claim for (1) punitive damages in the products liability action predicated on negligence or strict liability in tort; (2) punitive damages in the action which survives the death of the injured person; (3) punitive damages in the actions by the parents for damages for loss of society and companionship of a child and for loss of the minor's earning capacity and medical expenses. We further hold that the complaints fail to state a claim for punitive damages in the wrongful death action.

*By the Court.*—Decision of the court of appeals affirmed in part and reversed in part; order of the circuit court affirmed in part and reversed in part; and cause remanded to the circuit court.

DAY, J. (*concurring in part, dissenting in part*). I concur in the majority opinion except I dissent from the holding that punitive damages are not available in wrongful death actions. I would hold punitive damages may be assessed in a proper case. The whole theory of punitive damages as set forth in the majority opinion is to serve to punish one who engages in outrageous[1] conduct and as a deterrent to future such conduct by the defendant or by those who might otherwise engage in such conduct.

---

[1] As that term is defined in the majority opinion.

While it is true, as the majority opinion states, that the legislature has historically limited the kinds of damages which could be awarded in wrongful death actions and has limited the amount of recovery, there exists no express limitation in sec. 895.04, Stats., on the right to recover punitive damages in a wrongful death action, and no such limitation should be read into the statute.

The supposition in the majority opinion that the legislature did not intend to allow the award of punitive damages because the legislature ". . . has feared that passion would run high where the wrongdoer causes death and that huge damage awards would be imposed on the wrongdoer" (*supra*, p. 314) is unsupported. No legislative intent can be discerned from the statute, and the majority cites no current legislative history to support its theory of legislative intent, except for now defunct limitations on wrongful death recovery. (There is, however, still a $10,000 limitation for loss of society and companionship.) As one noted writer has observed:

"The arguments in favor of limited awards in death actions at bottom turn on a fear of excessive awards. The fact is, however, that there is no more sympathy danger in death cases than in many personal injury cases, and in any event there are many devices for controlling excessive jury verdicts, such as the grant of remittiturs or new trials. In addition there are various forms of debtor-protection devices. . . .

"Apparently the case against arbitrary limits on recoveries in death actions has impressed legislatures, since a dwindling number of states now impose such limits." D. Dobbs, *Law Of Remedies*, §8.5 (1973).

Indeed this argument has impressed our own legislature, for all dollar limitations have been lifted in wrongful death actions except as noted earlier, the limitation for loss of society and companionship. Because the focus of punitive damage awards is upon the conduct of the wrongdoer and not upon the victim, there is no reason

in policy or logic for this court to foster an "anomalous" (*supra,* p. 314) result in the present wrongful death statute.

COFFEY, J. *(dissenting).* I dissent because the majority has extended application of the concept of punitive damages, established by this court's prior case law, beyond the boundaries set forth in *Entzminger v. Ford Motor Co.,* 47 Wis.2d 751, 177 N.W.2d 899 (1970) :

"Punitive damages are not allowed for a mere breach of contract, . . . or for all torts or for crimes but generally for those personal torts, which are malicious, outrageous or a wanton disregard of personal rights which require the added sanction of a punitive damage to deter others from committing acts against human dignity. . . . The type of cases allowing punitive damages has been cases of assault and battery, slander and libel, seduction, malicious prosecution, breach of promise, and the like. Despite repeated criticism of the punitive-damage rule, this court has adhered to it but has refused to extend the doctrine. However, in a most recent case, the court did lay down, as an additional requirement, that where no actual malice is shown the character of the offense must have the outrageousness associated with serious crime." *Id.* at 757–58.

The majority relies on a portion of this quotation. I have included the entire passage.

In this case the majority, contrary to the holding in *Entzminger v. Ford Motor Co., supra,* has allowed recovery of punitive damages for a nonpersonal tort. The purpose of a strict liability action is to allow recovery of compensatory damages where injuries are caused by an unreasonably dangerous product without requiring proof of specific acts of negligence. Ghiardi and Koehn, *Punitive Damages in Strict Liability Cases,* 61 Marq. L. Rev. 245, (1977). *Dippel v. Sciano,* 37 Wis.2d 443, 155 N.W.2d 55 (1967). The doctrine of strict liability in tort is in essence a *no fault concept* and it is the con-

dition of the product (whether it is defective and unreasonably dangerous) rather than the conduct of the actor or manufacturer that determines liability. Recovery of punitive damages is based on a finding of *aggravated fault* and thus the conduct of the manufacturer is the sole determinant of liability. Therefore, in a case of strict liability in tort, the conduct of the manufacturer is not at issue, and thus it is singularly inappropriate to allow punitive damages in an action where the standards for recovery of compensatory damages have been so relaxed.

The majority has created a separate tort of outrageous conduct, not associated with a serious crime, and without any standard at all to determine whether the conduct is in fact outrageous. It is clear that the tort is something separate from a claim for strict liability because this case arises on a motion to dismiss. If punitive damages were no more than an incident of a claim for compensatory damages, there would be no separate claim for the court to consider, and a motion to dismiss would not lie. *Draeger v. John Lubotsky Motor Sales,* 56 Wis.2d 419, 202 N.W.2d 20 (1972). In *Draeger* there was no need to consider punitive damages as a separate claim because the claim for compensatory damages was grounded on fraud. Therefore, the allegations supporting the prayer for compensatory damages also supported the prayer for punitive damages.

There is no need for the majority to go that far. If the acts of the Ford Motor Company constituted outrageousness associated with serious crime, they could have been pleaded as part of the claim for compensatory damages. In that case, the prayer for relief could have included punitive damages. However, the court should not permit the claim for punitive damages based on outrageous conduct to be joined for trial with a claim for compensatory damages grounded on the lesser, relaxed standards of strict liability. If the majority insists on

legislating punitive damages, I believe the strict liability claim should be severed from the claim for punitive damages and tried separately before a different jury. The majority has extended an invitation to the unscrupulous plaintiff to buttress a weak strict liability case with a claim for punitive damages and thus prejudice the jury.

I agree that the question of whether to abolish punitive damages is not for this court to decide, as it has been a part of our law for so long.[1] However, I also believe that this court should not extend the recovery of punitive damages to any class of cases other than those in which they have been historically permitted, beyond the outer limits of punitive damages defined in *Entzminger v. Ford Motor Co., supra*. Any further extension of the applicability or recoverability of punitive damages is judicial legislation just as surely as a decision to abolish the doctrine of punitive damages would be. I will not be a party to the intrusion by the majority into the areas of public policy which must be reserved for the legislature.

As Chesterfield Smith, the former president of the American Bar Association, said in his Law Day address:

". . . courts are being asked today to solve problems for which they are not institutionally equipped, or at least not as well equipped as other areas of government [such as the legislature].

". . . As far as possible, judicial forums should be reserved for doing only that which cannot be done elsewhere.

"The American public perceives the courts as a jack-of-all trades available to furnish the answer to whatever may trouble them. Shall a war be prosecuted or peace made? What is life, or when does death begin? Shall racial integration be achieved by . . . busing of children to far away schools? How shall prisons and mental institutions be operated? Shall nuclear power plants be built, and if so, where? Shall the Concorde fly

[1] *Bass v. The Chicago & Northwestern R'y. Co.*, 42 Wis. 654 (1877).

to these shores? Is affirmative action really inverse discrimination? Shall the snail darter survive? [Should punitive damages be recovered in a products liability case?] . . .

"The courts properly should be only the conflict resolvers and not the problem solvers of American society."

This court has recently expounded Smith's philosophy in *State v. Princess Cinema of Milwaukee,* 96 Wis.2d 646, 292 N.W.2d 807 (1980), and refused to infringe on the legislative prerogative of enacting statutes to implement public policy in the following language: "The problems of public policy . . . are for the legislature." and further, "recognizing that our job is one of interpreting statutes not redrafting them." *Id.* at 661, 662. To the same effect, in *State v. I, A Woman—Part II,* 53 Wis.2d 102, 191 N.W.2d 897 (1971) this court held:

"There is no doubt that carefully drafted legislation will accomplish this purpose, but this requires fact finding and public policy determinations that only the legislature can furnish." *Id.* at 120.

We are without the benefit of citizen input or a trained staff to search out, weigh, balance and comprehend the economic problems created by the majority. With only the opinions and prejudices of those commentators with whom the majority agrees as a foundation, the majority heedlessly delivers a potential knockout punch to many men and women in the work force by mandating punitive damages in a products liability case. The short memories of the author of the majority opinion and three of the justices joining her are most surprising. Little more than a year ago they extolled the virtues of the legislative process for the making of policy determinations in matters relating to products liability cases, expressing a strong preference for legislative fact-finding over suggestions for legislation from this court as follows:

"It is presumptuous for this court, which does not and cannot have the benefit of public hearings and constituent expression of opinion, to 'commend' *sua sponte* any specific change in the applicable period of limitations. It is enough for us to note that the determination of a period of limitations in respect to products liability presents a substantial problem, worthy of the legislature's consideration." *Kozlowski v. John E. Smith's Sons, Co.,* 87 Wis.2d 882, 904, 905, 275 N.W.2d 915, 927 (1979).

There are strong arguments for denying punitive damages in a strict liability case, presenting a substantial problem worthy of the legislature's consideration:

1. Permitting the recovery of punitive damages in product liability cases will have an adverse economic impact and be financially destructive to employees and employers alike. How many times are punitive damages to be awarded for the same act? In this case, the majority would apparently allow punitive damages to be awarded twice, once to the injured minor and once to the parents. The design defect alleged in this case has been the subject of other litigation in many other states. Are the Wisconsin courts to monitor the courts of the other 49 states so as to insure that a Wisconsin court's award of punitive damages does not place an undue burden on the manufacturer and his employees? As Judge FRIENDLY stated in *Roginsky v. Richardson-Merrell, Inc.,* 378 F.2d 832 (1967):

"The legal difficulties engendered by claims for punitive damages on the part of hundreds of plaintiffs are staggering. If all recovered punitive damages in the amount here awarded these would run into tens of millions, as contrasted with the maximum criminal penalty of 'imprisonment for not more than three years, or a fine of not more than $10,000, or both such imprisonment and fine', 21 U.S.C. §333(b), for each violation of the Food, Drug and Cosmetic Act with intent to defraud or mislead. We have the gravest difficulty in perceiving how claims for punitive damages in such multiplicity of actions

throughout the nation can be so administered as to avoid overkill."

". . .

". . . the apparent impracticability of imposing an effective ceiling on punitive awards in hundreds of suits in different courts may result in an aggregate which, when piled on large compensatory damages, could reach catastrophic amounts. If liability policies can protect against this risk as several courts have held, the cost of providing this probably needless deterrence, not only to the few manufacturers from whom punitive damages for highly negligent conduct are sought but to the thousands from whom it never will be, is passed on to the consuming public; if they cannot, as is held by other courts and recommended by most commentators a sufficiently egregious error as to one product can end the business life of a concern that has wrought much good in the past and might otherwise have continued to do so in the future, with many innocent stockholders suffering extinction of their investments for a single management sin." *Id.* at 839, 841.

*Roginsky* was the *first of 75 similar cases pending in the Federal District Court for the Southern District of New York against Richardson-Merrell Co.* for injuries resulting from use of a drug manufactured by them. The majority suggests that the danger of excessive multiple punitive damages may be effectively mitigated by apprising the jury of "compensatory and punitive damages and fines and forfeitures already imposed on the defendant or likely [!] to be imposed on the defendant." The prejudicial and inflammatory effect of such evidence is apparent. I doubt that any award could be sustained on such a record.

The cumulative effect of the imposition of punitive damage awards (which are open-ended because the amount of damages awarded is left to the jury's absolute discretion) in multiple lawsuits would be to threaten the very existence and economic life of the manufacturer. Is this the form of "corporate capital punishment" that the majority intended? The majority wants to re-

view *corporate economic decisions to insure that these de-
cisions coincide with the majority's view of social respon-
sibility.*

There are two categories of persons who will automati-
cally bear the costs of the majority decision, depending
on the strength and market position of the manufacturer:
(1) the employees and stockholders; or (2) the consum-
er-taxpayer. If the manufacturer is not in a strong fi-
nancial position so as to be able to bear these added
costs, he will be faced with the threat of being forced
out of business or into bankruptcy, thus resulting in a
loss of jobs (unemployment) and the curtailment of
competition, to the detriment of the consumer. If bank-
ruptcy or the loss of business and jobs is to be avoided,
it is the consumer who will ultimately bear the burden of
punitive damage awards through the payment of higher
prices for the goods in the market place. As the cost of
such damages is passed on through higher product prices,
the consumer will foot the bill for a penalty imposed
for its very own protection. If the consumer does not
pay higher prices, as a taxpayer, he will pay for the
hidden costs of government with higher taxes for in-
creased welfare, retraining and unemployment programs
occasioned by business failures. Moreover, imposition of
multiple punitive damage awards could have an adverse
impact not only on the manufacturer, Ford, but also
those commercial businesses that supply materials for
use in construction of cars, such as the producers of auto-
mobile locks, tires, catalytic converters, etc. Are we go-
ing to further intimidate Wisconsin manufacturers with
the threat of high punitive damage awards? The recov-
ery of punitive damages against American businesses re-
sulting in higher product costs obviously magnifies their
disadvantage in competition with foreign manufacturers.

2. Punishment and deterrence, the avowed goals of
punitive damages, may also be accomplished through the
state criminal laws, the federal Consumer Products

Safety Act and the state counterpart. Punishment and deterrence are proper goals of the criminal justice system, not the civil tort law. In *Bielski v. Schulze,* 16 Wis.2d 1, 114 N.W.2d 105 (1962) this court held that:

"The protection of the public from such conduct [gross negligence] or from reckless, wanton or wilful conduct is best served by the criminal laws of the state. . . ." *Id.* at 18.

Thus, criminal penalties were envisioned by this court in *Bielski v. Schulze, supra,* as a remedy available to parties who are aggrieved and feel the need for punishment. Moreover, the federal Consumer Products Safety Act provides protection against unreasonably dangerous products:

A.   through the establishment of specific safety standards; and

B.   by imposing civil penalties of up to $500,000 per defective product.

Since the means of punishing reckless and unscrupulous manufacturers and of deterring others from engaging in similar conduct already exists, there is no need for this court to make punitive damages available in products liability actions. The extension of punitive damages into products liability cases only serves to increase the number of times a manufacturer can be punished for marketing the exact same product. Now with this decision a manufacturer can possibly be punished four separate times: criminally, civilly (punitive damages), pursuant to the federal regulations (Consumer Products Safety Act) and pursuant to sec. 100.42 of Ch. 100 of the Wisconsin Statutes, entitled Marketing, Warehouses, Trade Practices, for the exact same conduct. This is contrary to the requirements of justice:

"Justice requires that limits be placed on punishment; that one jury's mulct should be enough; that the windfall of punitive damages designed originally to punish one

be limited to its original purpose. Justice requires that when society has punished once by criminal sanctions, society should be content. It should not demand or permit successive punishment by the device of punitive damages." Tozer, *Punitive Damages and Products Liability,* Insurance Counsel Journal, (1972) at 304.

The fact that a manufacturer may be subject to multiple forms of punishment will only serve to inhibit experimentation and the introduction of new products on the market and thus stifle potential future commercial development for which this nation is well-known.

Another adverse by-product of the majority's holding is that an already overburdened court system is further encumbered with needless lawsuits. If the court is determined to extend punitive damage liability to strict liability cases, it should reexamine the policy of allowing once compensated litigants to retain, for their own benefit, the entire punitive damage award. The punitive damage award is a windfall recovery over and above any compensatory damages received. In *Hartford Accident and Indemnity Co. v. Village of Hempstead,* 48 N.Y.2d 218, 422 N.Y.S.2d 47 (1979), the New York Court of Appeals stated that the purpose of punitive damages is to punish and deter others from acting similarly and that such damages are a "windfall" to the plaintiff who has been made whole by the award of compensatory damages. Public policy would be better served by allowing plaintiffs reimbursement for their attorneys' fees and ordering the payment of the balance of the award into a fund to be administered by the court, the proceeds of which should be used to defray the added administrative costs (court personnel, courtroom costs, jury expenses, etc.) of the litigation invited by today's decision. This does no violence to the policy underlying the awards of punitive damages because it will not be necessary to hold out the prospect of a windfall recovery in order to encourage plaintiffs to bring punitive damage suits. Some lawyers will

be more than happy to include punitive damage claims as a means of insuring full payment of their fees. The "alleged victims" of the "outrageous" corporate conduct will still have the satisfaction of seeing their rights vindicated. Our legislature has provided a limited right of compensation to the victims of certain crimes. How much greater is the bonus which the majority offers those "alleged victims" of the strict liability crime the court legislates in this case.

3. The doctrine of punitive damages does not provide the defendant with the benefits of the constitutional safeguards afforded in criminal proceedings:

". . . the same operative facts which would result in indictment in a criminal case may be the basis for a civil case and that the award of punitive damages in such a situation raises questions under the Fourth, the Fifth, the Sixth, the Eighth and the Fourteenth Amendments, particularly with respect to multiple punishment and double jeopardy without any of the safeguards afforded by the criminal law [such as proof beyond a reasonable doubt, the defendant's privilege against self-incrimination]." Fulton, *Punitive Damages in Product Liability Cases*, the Forum, Vol. 15, pp. 129–31 (Fall, 1977).

As one legal commentator has recently stated:

"Punitive damages for tortious conduct is the only area of law where an American citizen can be severely punished by other citizens without clear guidelines or evidentiary safeguards of due process well known to all other legal punishment." Haskell, *Punitive Damages: Expanded Application Creates Problems*, The National Law Journal, p. 25 (1978).

I believe that if this court is going to impose such a severe punishment on manufacturers and their employees, then they must be provided with safeguards similar to those provided in criminal law under the constitution and statutes.

4. Punitive damages serve as a bonus, added reward or windfall to the injured party. As a result, the exten-

sion of punitive damages to the product liability cases "will undoubtedly encourage counsel in some cases to pursue *unmeritorious* claims and manufacturers will sometimes have to settle such claims in excess of their fair value because of the risk, however remote, of large jury awards." Owen, *Punitive Damages in Products Liability Litigation,* 74 Mich. L. Rev. 1257, 1290 (1976).

In light of the above public policy considerations and ramifications, I believe the legislative branch, with its superior factfinding capabilities, is best able to deal with the question of whether punitive damages should be recovered in a products liability case. As stated in *Kozlowski v. John E. Smith's Sons Co., supra* at 904:

> "The myriad of problems and solutions in this complex area of products liability law should be the subject of hearings and debates in the legislature in order to balance the scales of justice between the manufacturer and the consumer."

The majority has unwisely usurped the legislative function in this case, and, for the above reasons, I must dissent. Let us allow our democracy to function in the manner the framers of our constitution intended. Let each of the three branches of government operate independent of one another. Let no branch usurp or invade the province or responsibility of another. Let not the majority further roil the already turbulent waters of products liability by riding a "new wave" of social, economic and political improvement. If social welfare experimentation is to be conducted, it should be done by the legislature. The implications for the free enterprise system, and therefore the structure of our economy, are too disturbing to leave a decision of this magnitude to five jurists.

I am authorized to state that Mr. Justice CONNOR T. HANSEN joins in this dissent.